**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| INTERSPAN DISTRIBUTION CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-07-1078 |
| | § | |
| LIBERTY INSURANCE | § | |
| UNDERWRITERS, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The facts described in this complaint belie the stereotype that insurance coverage disputes are dry or uninteresting.  The plaintiff, Interspan Distribution Corp., sued its insurer, Liberty Insurance Underwriters, Inc., for refusing to pay Interspan's claims under a Special Coverages Policy.  This policy included in the covered hazards "Kidnap/Ransom" and "Extortion Bodily Injury."  Interspan alleged that in 2006, its Uzbekistan tea-importation business was the target of a scheme orchestrated by members of one of Uzbekistan's most powerful families to force Interspan to stop doing business in that country and to abandon its business assets so that this family could take them over.  Interspan alleges that the scheme included kidnapings of three relatives of Interspan's principals; demands to surrender Interspan's business assets to obtain their release; threats of bodily injury against the kidnaped individuals as well as against Interspan's principals; and the illegal use of the courts, criminal proceedings, and judgments against these individuals and Interspan itself.

In 2006, after Interspan's assets had been seized and its business in Uzbekistan lost, Interspan submitted a claim to Liberty for these losses.  Liberty refused to pay, denying coverage.  Interspan filed this suit on March 30, 2007, seeking both damages for breach of the insurance policy and extracontractual damages for bad faith in denying coverage.  (Docket Entry No. 1).  Liberty moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Docket Entry No. 7).  Interspan responded.  (Docket Entry No. 11).  In an oral hearing, this court requested additional briefing to take into account the Supreme Court's opinion in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  The parties filed additional briefs.  (Docket Entry Nos. 16, 18, 19, 21, 22).  In the motion and briefs now before this court, the parties have not raised the issue of whether the alleged involvement of Uzbekistan  government officials in the events negates coverage under the "Act of State" doctrine.  The issue is whether, setting the "Act of State" question aside, Interspan's complaint states a claim for breach of the policy's ransom and extortion coverage provisions.

Based on the motion and the response, the parties' submissions, the record, the arguments of counsel, and the applicable law, this court denies the motion to dismiss.  The reasons for this decision are set out below.

## I.    The Policy Provisions

Liberty issued Interspan Special Coverages Policy number 180472-013 on June 20, 2003.  The policy coverages at issue are Hazard 1, Kidnap/Ransom; Hazard 2, Extortion Bodily Injury; and the Legal/Medical Expense Coverage.  Both Hazards 1 and 2 provide that

Liberty will indemnify Interspan for "loss," defined as  the "sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the Insured as a ransom or extortion payment," caused by the circumstances covered under each Hazard.

Hazard 1 covers losses caused by "Kidnap/Ransom."  It provides:

> Hazard 1.  Kidnap/Ransom:
> by reason of the actual or alleged KIDNAPPING of an Insured Person, RELATIVE or GUEST while such person is within the territory described in Item 3 of the Declarations

The policy defines "Kidnapping" as "an involuntary abduction of an insured person, RELATIVE, or GUEST and the holding of such person by persons who demand money or other consideration in exchange for the release of the captive person."   The policy defines "RELATIVE" to include "an Insured Person's: spouse, siblings, brothers-in-law, sisters-in-law, living ancestors. . . ."  To recover under Hazard 1, Interspan must show that there was: (1) an involuntary abduction; (2) of an insured person, relative, or guest; (3) within the territory; (4) a demand for money or other consideration in exchange for their release; and (5) loss.

Hazard 2 covers losses caused by "Extortion/Bodily Injury."  It provides:

> Hazard 2.  Extortion Bodily Injury:
> by reason of the receipt of a threat, communicated directly or indirectly to the insured to kill, injure or kidnap an Insured Person, RELATIVE OR GUEST while such person is within the territory in Item 3 of the Declarations.

Hazard 2 does not require a demand for money or other consideration.  To recover under Hazard 2, Interspan must show: (1) a threat communicated directly or indirectly to the

3

insured to kill, injure, or kidnap; (2) an insured person, relative, or guest; (3) within the territory; and (4) loss.

The policy also provides coverage for "Legal/Medical Expenses," which it defines to include "legal judgments . . . incurred by the INSURED based on or arising out of incidents insured by this Policy. . . ."

## II.   The Allegations in the Complaint

Liberty argues that in the complaint, Interspan does not allege facts showing involuntary abduction, a ransom demand ("by persons who demand money or other consideration in exchange for the release of a captive person"), or a ransom payment ("monies or . . . other consideration surrendered . . . as a ransom"), as necessary to satisfy the elements of coverage under Hazard 1.  Liberty argues that as to Hazard 2, Interspan does not allege facts showing an extortion threat ("a threat, communicated . . . to kill, injure or KIDNAP"), or an extortion payment ("monies or . . . other consideration surrendered . . . as . . . extortion payment").    The pertinent allegations are set out below.

### A.   Background

Interspan's operations in Uzbekistan included importing, marketing, distributing, and selling teas and other consumer products throughout that country.  Interspan is incorporated under the laws of the Bahamas and has its principal place of business in The Woodlands, Texas.  Centrax International Distribution LLC owns fifty percent of Interspan.  Eric Johnson is Centrax's president and one of Interspan's officers.  The other fifty percent of Interspan is owned by Emir Kiamilev, who is also an Interspan officer.  Both Johnson and Kiamilev

lived in the United States during the relevant period.  Johnson's brother-in-law, Mikhail Matkarimov, and Kiamilev's father, Eskender Kiamilev, lived in Uzbekistan.  Although neither had operational responsibilities, both watched over Interspan's assets in Uzbekistan on behalf of Johnson and Emir Kiamilev.

Interspan employed approximately seventy-five Uzbek citizens in Uzbekistan, rented office space and a warehouse in the Uzbek capital of Tashkent, and owned several ground transportation vehicles in that country.  (Docket Entry No. 1, ¶ 25).  Interspan's tea business was highly successful and profitable.  In May 2005, Interspan controlled approximately thirty percent of Uzbekistan's packaged-tea market.  (*Id.*, ¶ 32).

Interspan alleges that during the time it conducted business in Uzbekistan, that country was run by an authoritarian president, Islam Karimov, whose regime was marked by corruption and abuse of power.  Interspan alleges that Karimov's oldest daughter, Gulnara Karimova, used her political position and power to "amass personal wealth by forcibly taking over businesses and seizing their assets."  (Docket Entry No. 1, ¶ 53).  Interspan alleges that Karimova and those under her control abducted, held hostage, and threatened Interspan personnel and officers, and their relatives, as part of a scheme to obtain control over Interspan's business, to seize Interspan's assets, and to force Interspan out of Uzbekistan. Interspan alleges that its personnel and their relatives were released only because Interspan surrendered all of its business assets in Uzbekistan and ceased doing business there. Interspan notes that while it was doing business in Uzbekistan, companies in which Karimova held interests controlled only two percent of Uzbekistan's tea market.  After

5

Interspan closed its business operations in Uzbekistan, Karimova's companies controlled sixty-seven percent of that market.  (*Id.*, ¶ 118).

Interspan spends twelve pages in its complaint on factual allegations setting out publicly available information on the use of extortionate methods, including "sham" criminal proceedings, by corrupt officials in the Uzbeki government to seize and obtain control over private businesses and business assets.  (*Id.*, ¶¶ 35–64).   Interspan includes specific allegations taken from publicly available reports of corruption within Uzbekistan's criminal justice system.  These reports include incidents of illegal arrests, kidnappings of individuals by government agents, extortion, prosecutions on falsified charges, torture, and life-threatening prison conditions. (*Id.*, ¶¶ 36–37, 40–48).  According to Interspan, it was widely known that Uzbekistan's president and his daughter, Gulnara Karimova, used the country's criminal justice system to acquire the assets of successful privately owned businesses by arresting people associated with those businesses and threatening them with physical harm, cruel treatment, and lengthy prison terms.  Against this context, Interspan alleges specific facts that it asserts amounted to a kidnapping and extortion scheme to force Interspan to surrender its business and business assets in Uzbekistan to Karimova to secure the release and safety of the individuals who were abducted.

**B.     The Specific Allegations Under Hazards 1 and 2**

The complaint alleges that on February 13, 2006, Eskender Kiamilev, the father of Interspan's principal owner, Emir Kiamilev, was abducted against his will through a bogus "arrest."  The arrest was made by "hooded men with machine guns" who were part of the

6

Committee for National Security, Uzbekistan's intelligence agency. The same day that Eskender Kiamilev was abducted, armed government agents seized Interspan's physical property, including Interspan's offices and warehouse in Tashkent. (Docket Entry No. 1, ¶¶ 65–66). Corporate Risk International ("CRI"), a global crisis-management firm hired by Liberty to advise Interspan, concluded that Karimov's family was behind the seizure and incarceration and that the family intended to "dismantle Interspan's business operations" in tea, which was considered to be a state-controlled commodity. (*Id.*, ¶ 76). CRI advised Interspan that there was no legal basis for Eskender Kiamilev's arrest, that he was abducted to frighten and intimidate him in order to remove him from the tea business, and that the authorities would lose any interest in detaining Eskender Kiamilev if Interspan surrendered its business. (*Id.*, ¶¶ 73–77). CRI informed Interspan that several Interpsan employees were beaten or threatened with torture by government agents to coerce them into signing statements to be used as evidence against Eskender Kiamilev. Interspan alleges that Eskender Kiamilev suffered from a serious heart condition that was exacerbated by the stress of his abduction and incarceration. Interspan alleges that the threat of prolonged incarceration under the harsh conditions of the Uzbeki jail and with no medical care was a threat of bodily injury. (*Id.*, ¶¶ 77–78).

Due to the efforts of CRI and the U.S. Embassy, and because he was a former Soviet diplomat, Eskender Kiamilev was released eight days after his abduction. (*Id.*, ¶ 79). The complaint alleges that as soon as Eskender Kiamilev was released, another individual associated with Interspan was targeted. This individual was Mikhail Matkarimov, Johnson's

brother-in-law.   The complaint alleges that because Mikhail Matkarimov could not immediately be located, his wife, Natasha Matkarimova, was abducted in his place.  (*Id.*, ¶ 82).  The complaint alleges that those who abducted Natasha Matkarimova demanded that her husband surrender himself to secure her release.  Because "[i]t is widely reported that Uzbek authorities will resort to torture, sexual assaults and beatings against family members in order to coerce desired behavior of other targets," the complaint alleges, "Interspan understood that a threat of bodily injury was implicit in Natasha Matkarimova's abduction." (*Id.*, ¶¶ 82–83).  The complaint alleges that "[d]ue to his wife's abduction and the threat of bodily injury associated with that abduction, Mr. Matkarimov was forced to surrender himself to the government who Interspan was advised were operating under Gulnara Karimova's direction."  (*Id.*, ¶ 83).

To secure his wife's release, Matkarimov voluntarily surrendered and remained in custody for approximately six months.  He was criminally charged and prosecuted for grand theft, illegal sale of goods through the black market, trading in contraband, and involvement in a criminal organization.   The complaint alleges that during his six-month detention, Matkarimov was denied medical treatment for a bleeding ulcer and suffered bodily injury as a result.   During this period, CRI advised Interspan that there was no legitimacy to the charges against Matkarimov, that the Uzbek authorities were not following Uzbek law, that Matkarimov was a "hostage," and that the people behind the arrest and prosecution were Gulnara Karimova and her business associates.  (*Id.*, ¶¶ 85–104).  Interspan alleges that the arrest, incarceration, and prosecution of Matkarimov constituted a threat of bodily injury

"[g]iven the threat of bodily injury that Interspan understood was implicit in most criminal prosecutions in Uzbekistan." (*Id.*, ¶ 99).  Based on the illegal nature of Matkarimov's arrest, detention, and trial, the lack of evidence supporting the charges against Matkarimov, its knowledge of the Uzbek legal and political system, and the methods employed by Gulnara Karimova and her  associates and their interest in Interspan's business, CRI informed Interspan that Matkarimov was being held solely to exert pressure on Interspan to surrender its assets and that Interspan would have to surrender its assets in order to secure his release. (*Id.*, ¶¶  94–108).  Before the conclusion of Matkarimov's trial, the prosecutor issued a decree allowing Interspan's previously seized physical property to be sold.  (*Id.*, ¶ 109). After the "trial," which Interspan alleges was a "sham," Matkarimov was convicted of all charges.  His sentence was three years of probation, a $10,000 fine, and a requirement that he work for the government and pay 20% of his salary back to the government for two years. The criminal judgment also provided that the seized property, which had already been sold, would not be returned.  (*Id.*, ¶¶ 111–12).

CRI warned Interspan that if its principals, Johnson and Kiamilev, returned to Uzbekistan to try to continue doing business, they would be arrested on criminal charges, and that Interspan would have to surrender its business assets in exchange for Matkarimov's release.  "Based on that threat, and on Interspan's understanding of the demands regarding Mr. Matkarimov, Mr. Johnson and Mr. Kiamilev did not return and, instead, surrendered all of Interspan's business assets in Uzbekistan.  Interspan's assets were ultimately taken over by companies reported to be controlled by Gulnara Karimova and her business associates."

9

(*Id.*, ¶¶ 113–14).   Companies reported to be controlled by Karimova and her business associates took over the importing, marketing, and distribution of Interspan's three tea brands through Interspan's proprietary distribution network, appropriated Interspan's intellectual property in the tea brands, and gained the benefit of Interspan's substantial good will. Matkarimov was released after the takeover of Interspan's operations.   He was granted amnesty two months after his conviction.   (*Id.*, ¶¶ 113–16).   Interspan demanded that Liberty cover the losses of its Uzbekistan business and business assets.   Liberty denied coverage. This lawsuit, and the motion to dismiss, followed.

## II.    The Applicable Legal Standards

### A.    The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."   FED. R. CIV. P. 12(b)(6).   The Supreme Court recently clarified the standards that apply in a motion to dismiss for failure to state a claim.   In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007), the Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a),  which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."   FED. R. CIV. P. 8(a)(2).   Since *Twombly*, the Courts of Appeals and district courts have written extensively, seeking to understand and apply the Supreme Court's explication of the pleading test.   *See, e.g., Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008); *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773 (7th Cir. 2007); *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007); *Ridge at Red Hawk, L.L.C.*

*v. Schneider*, 493 F.3d 1174 (10th Cir. 2007); *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289 (11th Cir. 2007).

In *Twombly*, the Supreme Court granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct. *Twombly*, 127 S.Ct. at 1963. The plaintiffs had alleged that the major telecommunications providers had engaged in illegal anticompetitive conduct, in violation of section 1 of the Sherman Act. The Court upheld the district court's dismissal of their claims at the pleading stage on the basis that the factual allegations were insufficient. The Court found that the plaintiffs had alleged parallel conduct by the defendants but had not alleged an illegal contract to restrain trade, necessary to show entitlement to relief under the statute. *Id.* 1966. The Court held that because parallel conduct, without more, could be consistent with conspiracy or with legitimate business behavior, the factual allegations were insufficient to show a basis for relief. In reaching this decision, the Supreme Court rejected language that long had formed part of the Rule 12(b)(6) standard, the statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), that a complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Instead, the Court stated that under the pleading rules, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." 127 S.Ct. at 1964-65, 1965 n.3. The Court

explained what would be required to move from "speculative" to "plausible" and withstand a motion to dismiss:

> In applying these general standards to a §1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id.* at 1965.  The Court held that although the factual allegations in the (lengthy) complaint were "particular," and put the defendants on notice of what the case was about, the allegations were nonetheless insufficient to show entitlement to or grounds for relief because the allegations of conspiracy and illegal agreement were "conclusory."   The Court emphasized the importance of the "context" in which the allegations were raised:

> An allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a §1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Id.* 1966.  The Court emphasized that Rule 8 requires a "'showing,' rather than a blanket assertion, of entitlement to relief."  *Id.* at 1965 n.3.

Before *Twombly*, the general standard for reviewing a motion to dismiss under Rule 12(b)(6) was well established.  Courts were required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the nonmoving party.  Before *Twombly*, dismissal under Rule 12(b)(6) would not be appropriate unless it

12

appeared beyond doubt that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief.  In *Twombly*, the Supreme Court disavowed the "no set of facts" language from *Conley v. Gibson.  See id.* at 1968.  The Court instructed that "[t]his phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Id.* at 1969.  Courts have applied this change generally, not limited to antitrust cases.  *See Iqbal v. Hasty*, 490 F.3d 143, 157 n.7 (2d Cir. 2007) ("[I]t would be cavalier to believe that the Court's rejection of the 'no set of facts" language from *Conley* . . . applies only to section 1 antitrust claims."); *Phillips*,  515 F.3d at 230–31.

*Twombly* expressly reaffirmed that Rule 8 "'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" and that this standard does not require "detailed factual allegations."  *Twombly*, 127 S.Ct. at 1964 (*quoting Conley*, 355 U.S. at 47).  The Supreme Court also reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  *See id.* at 1964–65, 1969 n.8.  The Supreme Court did not address whether a court considering a motion to dismiss should continue to draw reasonable inferences in favor of the plaintiff, but the decision does not appear to undermine that principle.  *See Phillips* 515 F.3d at 231.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's [Rule 8] obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964-65 (alteration in original) (internal citations omitted).   The Court explained that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief."   *Id*. at 1965 n.3.   The emphasis on a "showing of an entitlement to relief" focused on the "context" of the short and plain statement of the claim and its grounds.   "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."   *Phillips*, 515 F.3d at 232, *citing Twombly*, 127 S.Ct. at 1965 n. 3.

The *Twombly* Court referred to "plausibility" as a measure of pleading sufficiency, stating that allegations must "nudge[] . . . claims across the line from conceivable to plausible" to survive a motion to dismiss. 127 S.Ct. at 1974.   One court has explained this as a statement that "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."   *Ridge at Red Hawk*, 493 F.3d at 1177. At the same time, *Twombly* stated that the Court was not adopting or applying a "heightened pleading standard."   127 S.Ct. at 1974 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").   This aspect of the opinion has generated uncertainty in the lower courts.   *See, e.g., Iqbal,* 490 F.3d at 157 ("These conflicting signals

14

create some uncertainty as to the intended scope of the Court's decision."); *Phillips*, 515 F.3d at 233–34.

In explaining the "plausibility" standard, the Third Circuit has pointed out that it is "related to the requirement of a Rule 8 'showing.'" *Id.* at 234.  A "'showing' requires only notice of a claim and its grounds," in contrast to "a pleader's bare averment that he wants relief and is entitled to it." *Phillips*, 515 F.3d at 234. (*quoting Twombly*, 127 S.Ct. at 1965) (internal quotations omitted).   "The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." *Id.*  "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element. . . . This rule requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.'  That is to say, there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Id.*  at 234–35.  The Second Circuit has summarized the *Twombly* decision as endorsing "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal*, 490 F.3d at 157–58 (2d Cir. 2007).

The issue in this case is how to apply the *Twombly* standard in the context of this insurance coverage dispute.  Several courts have examined post-*Twombly* motions to dismiss in insurance coverage cases.  *See, e.g., Haspel v. State Farm Mut. Auto. Ins. Co.*, 241 Fed.

Appx. 837 (3d Cir. 2007); *Johnson v. GEICO Cas. Co.*, 516 F. Supp. 2d 351 (D. Del. 2007);

*Coleman Dupont Homsey v. Vigilant Ins. Co.*, 496 F. Supp. 2d 433 (D. Del. 2007); *Crocker*

*v. Combined Ins. Co. of Am.*, No. 07-964, 2007 WL 2345286 (W.D. Pa. Aug. 16, 2007).  In

*Coleman Dupont Homsey v. Vigilant Insurance Co.*, 496 F. Supp. 2d 433, an insured sued

his insurer for breach of contract, declaratory judgment, bad faith, and statutory fraud.  The

insurer moved to dismiss the bad faith claim on the basis that the complaint failed to allege

facts showing that the insurer denied or delayed payment without reasonable justification,

a necessary element of that claim.  The complaint contained allegations that the insurer

ignored the insured's claim for over a year and unreasonably construed the insurance contract

in determining the amount the insured was owed.  The court denied the motion to dismiss,

finding that "[b]ased on these allegations, Plaintiffs' theory of bad faith is evident, at least

by inference.  Plaintiffs contend that given the relatively small amount of funds ultimately

remitted by Vigilant and the relatively uncomplicated theory supporting its basis for the

payment, the delay in payment was unreasonable, as was the theory of construction used by

Vigilant to support it.  In the Court's view, these allegations are, in the circumstances of this

case, sufficient to state a plausible claim for bad faith breach of contract." *Id.* at 438.  The

cases do not identify a categorical approach to applying *Twombly* in insurance coverage

disputes.

### B.      The Standards for Breach of an Insurance Contract

Interspan has pleaded that Liberty's refusal to pay under the kidnap and extortion

hazard coverages breached the insurance contract.  The elements of a breach of contract

16

cause of action are the existence of a valid contract, the plaintiff's performance or tendered performance, the defendant's breach of the contract, and damages as a result of the breach. *Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769 (Tex. App.–Dallas 2005, pet. denied); *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 442 (Tex. App.–Houston [14th Dist.] 2004, no pet.).

"Under Texas law, insurance policies are interpreted in accordance with the rules of construction that apply to all contracts generally." *Sharp v. State Farm Fire and Cas. Ins. Co.*, 115 F.3d 1258, 1260 (5th Cir. 1997) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)).  Under Texas law, when faced with a coverage dispute, the court is to give effect to the parties' intentions as expressed by the policy language. *Ideal Lease Serv., Inc. v. Amoco Prod. Co.*, 662 S.W.2d 951, 953 (Tex. 1983).  Policy terms are to be given their plain, ordinary meaning unless the policy itself shows that the parties intended a different, technical meaning. *See Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984).  The court must interpret a policy's terms in view of the policy as a whole and its overall purpose. *Hartrick v. Great Am. Lloyds Ins. Co.*, 62 S.W.3d 270, 274 (Tex. Civ. App.–Houston [1st Dist.] 2001, no pet.) ("[W]e construe the terms of the policy as a whole, and consider all of its terms, not in isolation, but within the context of the policy.").

Interspan has also pleaded a right to punitive damages on the ground that Liberty breached its duty of good faith and fair dealing in denying the claims.  Under Texas law, a plaintiff may not recover punitive damages merely because the insurer has breached the

17

contract and breached its duty of good faith and fair dealing.   Instead, "[o]nly when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct does bad faith justify punitive damages." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994); *see also State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 47 (Tex. 1998).

Interspan has also pleaded violations of the Texas Insurance Code, Tex. Ins. Code § 541.060, and the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.50(a)(4), based on Liberty's denial of covered claims.  These causes of action require a predicate showing that the policy covered the claims.

## III.    Hazard 1: Kidnaping

To recover under Hazard 1, Interspan must show that there was: (1) an involuntary abduction; (2) of an insured person, relative, or guest; (3) within the territory; (4) a demand for money or other consideration in exchange for their release; and (5) loss, defined as the "sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the Insured as a ransom . . . ."  Liberty contends that Interspan has failed to plead facts showing a ransom demand or payment in exchange for the release of Eskender Kiamilev, Natasha Matkarimova, and Mikhail Matkarimov, or that Mikhail Matkarimov was involuntarily abducted.  (Docket Entry No. 7 at 5–7; Docket Entry No. 19 at 2).

### A.    Demand for Money or Other Consideration

Liberty argues that Interspan has failed to allege facts showing that an explicit demand for money or other consideration was made as a condition for release of those who were abducted.  Liberty argues that Interspan has merely alleged its subjective understanding that

those who abducted Eskender Kiamilev, Natasha Matkarimova, and Mikhail Matkarimov required Interspan to give up its business assets and activities in Uzbekistan to secure their release.  (Docket Entry No 19 at 2).  Liberty asserts that the factual allegations in the complaint are inconsistent with a demand for Interspan's business assets because the government seized at least some of Interspan's and Eskender Kiamilev's property when it arrested Eskender Kiamilev and had no need to demand assets that had already been seized. (*Id.* at 5).  Interspan responds that the existence of a ransom demand can be reasonably inferred from the facts set forth in its complaint and that its understanding that ransom was demanded was based on objective and verifiable facts.  (Docket Entry No. 11 at 12–14, 17–18).

The policy defines "kidnaping" as "an involuntary abduction of an insured person, RELATIVE, or GUEST and the holding of such person by persons who demand money or *other consideration* in exchange for the release of the captive person."  (Emphasis added.) The policy does not limit "kidnaping" to situations in which the demand for money or other consideration is made explicit.  Liberty contends that the allegations in Interspan's complaint that the abduction and seizure of assets was an implicit demand for money or other consideration are insufficient under *Twombly* because the allegations are equally consistent with the presence or absence of an implicit demand and therefore "factually neutral," not "factually suggestive."  *See Twombly*, 127 S.Ct at 1964, 1966 n.5.

In *Twombly*, the Court held that the allegations of parallel conduct combined with a "bare assertion" of conspiracy were insufficient because "parallel conduct does not suggest

conspiracy" and a "conclusory allegation of agreement at some unidentified point" did not

"supply facts adequate to show" a section 1 violation.   127 S.Ct. at 1966.   Interspan's

complaint does not suffer from a similar defect.   Rather, Interspan has made two categories

of allegations that together provide the "context" and the specific facts "adequate to show"

coverage.   *See id* at 1966.   First, Interspan has alleged in detail the circumstances facing

private, foreign-owned, businesses in Uzbekistan at the time.   Interspan has alleged in detail

that government officials employed kidnaping and other illegal and abusive tactics to obtain

these businesses and related assets for their own use and enrichment.   Second, Interspan has

alleged in detail the bases for its conclusion that the price of obtaining the release of the

individuals who were abducted was the relinquishment of Interspan's business and business

assets in Uzbekistan.   Interspan's claim that the kidnapings of its personnel and their relatives

was an implicit demand to surrender its assets was based on the sequence of events and on

CRI's analysis of the situation, which was in turn based on its knowledge of the specific

nature of business, politics, and power in Uzbekistan.

The complaint alleges that CRI informed Interspan that Eskender Kiamilev and

Mikhail Matkarimov would be released in exchange for Interspan surrendering its assets and

relinquishing any claim to recover them.   (Docket Entry No. 1, ¶¶ 75–76, 95–101).   An

expert analysis by a crisis-management company specializing in kidnaping, ransom, and

extortion, stating that those abducted would be released in exchange for payment in the form

of relinquishing business assets is neither  "factually neutral" nor a "formulaic recitation of

the elements of a cause of action."   *Twombly*, 127 S.Ct. at 1964–65, 1966 n.5.   Interspan has

made specific factual allegations showing how an implicit demand for money or other consideration was made for the release of Eskender Kiamilev and Mikhail Matkarimov.

The complaint does not allege that there was a demand for money or other consideration for the release of Natasha Matkarimova. Rather, the complaint alleges that "government agents abducted . . . Natasha Matkarimova . . . and demanded that Mr. Matkarimov surrender himself" in order to secure her release. (Docket Entry No. 1, ¶ 82). The definition of loss for Hazard 1 and 2 – the "sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the Insured as a ransom or extortion payment" – makes clear that "other consideration" requires monetary value. In its brief, Interspan acknowledges that it is not specifically alleging that when Natasha Matkarimova was abducted, there was a demand for "money or other consideration" to obtain her release. (Docket Entry No. 11 at 17–18). But Interspan does allege that Natasha Matkarimova's abduction was part of the scheme to obtain Interspan's business assets. Interspan alleges that CRI made it clear that the Uzbeki government would have no interest in arresting and detaining any Interspan personnel if Interspan surrendered its business and business assets. Interspan is not seeking to recover losses for business assets that it allegedly relinquished to obtain the release of Natasha Matkarimova. Although the asserted facts relating to Natasha Matkarimova, standing alone, would not suffice to allege coverage, the facts do present part of the context showing a scheme that began with Eskender Kiamilev's arrest and ended with Mikhail Matkarimov's arrest, prosecution, six-month detention, and conviction, which

required Interspan to surrender its business and business assets as the price for Matkarimov's release.  Interspan has alleged facts showing a covered "demand."

**B.    Loss**

Liberty asserts there was no "loss" because Interspan did not surrender its business assets to obtain the release of either Eskender Kiamilev or Mikhail Matkarimov, emphasizing that Interspan alleged that at least some of those assets had already been seized by the government or even sold before these individuals were released.  (Docket Entry No. 19 at 8).  Liberty asserts that Interspan "has failed to plead any facts showing that it surrendered its property in exchange for the release of these individuals. . . . Instead, Plaintiff merely concludes that, since these individuals were arrested and it lost its property, it surrendered its property in exchange for the release of these individuals."  (Docket Entry No. 16 at 4).  Interspan argues that it has alleged facts showing that it surrendered its business assets in exchange for the release of Eskender Kiamilev and Mikhail Matkarimov.  Interspan alleges that the loss of business assets applies under the policy even as to those assets that were seized when Kiamilev was arrested or during Matkarimov's detention, even before their release.

"Loss" is defined as the "sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the Insured as a ransom or extortion payment."  The complaint alleges that CRI warned Interspan that if its principals, Johnson and Emir Kiamilev, returned to Uzbekistan to try to continue doing business, they would be arrested on criminal charges.  Interspan alleges that CRI instructed it that Interspan would have to

surrender its remaining business assets in exchange for Matkarimov's release. "Based on that threat, and on Interspan's understanding of the demands regarding Mr. Matkarimov, Mr. Johnson and Mr. Kiamilev did not return and, instead, surrendered all of Interspan's business assets in Uzbekistan. Interspan's assets were ultimately taken over by companies reported to be controlled by Gulnara Karimova and her Business associates." (Docket Entry No. 1, ¶ 113). The complaint alleges that Mikhail Matkarimov was released only after Karimova and those related to her took over all of Interspan's business operations and assets. The complaint points out that after the business operations and assets were "surrendered," Matkarimov was granted amnesty, within two months of his conviction. (*Id.*, ¶¶ 115–16).

Liberty contends that Interspan's allegations that it surrendered its assets to obtain Matkarimov's release are inconsistent with its claim that its physical property was physically seized at the same time Eskender Kiamilev was arrested, that the criminal judgment against Matkarimov formally stripped Interspan of its legal ownership of the seized assets – some of which had already been sold – and that Interspan's remaining assets, including its distribution network, intellectual property, and goodwill, were appropriated by other entities. Interspan does not dispute that much of its physical business assets had been seized and appropriated even before Matkarimov was released from detention. Interspan alleges that the facts surrounding Matkarimov's release, the information from CRI, and the instructions from CRI that Interspan's principals should not return to Uzbekistan to try to recover the assets and continue operating the business show that the relinquishment of the business assets and operations was the price for Matkarimov's release. Interspan has alleged facts showing

that it "surrendered" these assets and operations in order to secure Matkarimov's release from custody.  These factual allegations show the basis for claiming a "loss" covered by Hazards 1 and 2 of the Liberty policy

### C.       Involuntary Abduction

Liberty contends that Mikhail Matkarimov was not "involuntarily abducted" because he voluntarily surrendered himself to secure the release of his wife.  The complaint alleges that "[d]ue to his wife's abduction and the threat of bodily injury associated with that abduction, Mr. Matkarimov was forced to surrender himself to the government who Interspan was advised were operating under Gulnara Karimova's direction."  (Docket Entry No. 1, ¶ 84).

The policy does not define "involuntary abduction."  The dictionary definitions indicate that an "abduction" involves the use of improper means, such as force or fraud, to lead or take a person away.  *See* 1 OXFORD ENGLISH DICTIONARY 19 (2d. Ed. 1989) (defining "abduct" as "[t]o lead or take away improperly, whether by force or fraud; to carry off, to kidnap."); BLACK'S LAW DICTIONARY 4 ( 8th ed. 2004) (defining "abduction" as "[t]he act of leading someone away by force or fraudulent persuasion."); Bryan A Garner, A DICTIONARY OF MODERN LEGAL USAGE 2d Ed. 4 (2d ed. 1995) (defining "abduction" as "the act of leading (someone) away by force or fraudulent persuasion.").  The policy defines "Kidnapping" as "an involuntary abduction of an insured person, RELATIVE, or GUEST and the holding of such person by persons who demand money or other consideration in exchange for the release of the captive person."  The complaint alleges that the demand that

Mikhail Matkarimov surrender himself in exchange for his wife, to secure her release, makes his surrender to the government agents an "involuntary abduction." (¶¶ 82–84). The complaint alleges facts supporting Interspan's claim that Mikhail Matkarimov was forced to surrender himself against his will and that as a result he was "involuntarily abducted."

## IV.  Hazard 2: Extortion Bodily Injury

To recover under Hazard 2, Interspan must show: (1) a threat communicated directly or indirectly to the insured to kill, injure, or kidnap; (2) an insured person, relative, or guest; (3) within the territory; and (4) loss, defined as the "sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the Insured as a ransom or extortion payment." Liberty contends that Interspan has failed to plead facts showing an extortion threat or payment. (Docket Entry No. 19 at 2).

### A.    Threat to Kill, Injure or Kidnap

Liberty argues that Interspan has failed to allege facts showing it received a threat to kill, injure, or kidnap Eskender Kiamilev, Natasha Matkarimova, Mikhail Matkarimov, Eric Johnson, or Emir Kiamilev. Liberty contends that the complaint alleges that the government investigated, detained, and prosecuted individuals associated with Interspan and that CRI speculated that the reason for these actions was to force Interspan to surrender its assets in Uzbekistan, but that the complaint does not allege explicit threats to kill, injure or kidnap. (Docket Entry No. 19 at 6). Liberty argues that the denial of medical treatment to Mikhail Matkarimov during his extended detention is simply "an allegation that something occurred, not that something was threatened." (*Id.*). Liberty argues that even if a threat was made to

25

arrest Interspan's principals on illegitimate grounds, this is not a threat to kidnap unless money or other consideration would be demanded. (*Id.* at 7). Interspan responds that it has alleged facts that support the inference of threats to kill, injure, or kidnap within the coverage established under Hazard 2. (Docket Entry No. 11 at 12–14, 19–22).

Hazard 2 requires a "threat to kill, injure or KIDNAP" an "Insured Person, Relative or guest" while that person is in the specified territory, "communicated directly or indirectly to the Insured." The policy specifically covers threats that are communicated indirectly. Again, the two categories of facts that Interspan alleges is instructive. The complaint alleges that publicly available information establishes that the Uzbek government uses unjustified criminal charges and convictions to impose long sentences in extraordinarily harsh conditions as a means of targeting specific people and exerting intolerable pressure on them to, among other things, surrender their property and assets. (Docket Entry No. 1, ¶¶ 35–64). This category of allegations provides the context for assessing the allegations as to the threats against the Interspan principals if they returned to Uzbekistan – they would be arrested and charged with serious crimes – and the threats posed by the long-term detention of Matkarimov – he was detained for six months with no medical care, despite serious medical needs, and efforts were made to link him to terrorist and criminal activity that would expose him to a very lengthy prison sentence. The complaint alleges that Eric Johnson and Emir Kiamilev were threatened with arrest if they returned to Uzbekistan, and that this threat of imprisonment was a threat to cause them bodily injury because of the risk of bodily injury associated with an arrest and incarceration in Uzbekistan. The complaint alleges that the

26

facts of Eskender Kiamilev's, Natasha Matkarimova's, and Mikhail Matkarimov's abduction and detention constituted threats of bodily injury because of the risk of bodily injury from privation, abuse, and torture associated with continued incarceration in Uzbekistan, and, in the case of Eskender Kiamilev and Mikhail Matkarimov, because of medical conditions that were not treated while they were detained.

Interspan's belief that threats had been made to injure Eskender Kiamilev, Natasha Matkarimova, Mikhail Matkarimov, Eric Johnson, and Emir Kiamilev was based the analysis provided by CRI from its knowledge about the risks of bodily injury posed by arrest and detention in Uzbekistan.  The expert analysis of a global security consulting firm about the reasons for the Uzbekistan government's actions, the message that the government was conveying to Interspan, and the likely consequences of Interspan's principals returning to Uzbekistan or refusing to surrender Interspan's assets, is not unfounded speculation.  *See Phillips*, 515 F.3d at 234.  The allegations in the complaint provide a detailed factual foundation for the claim that the Uzbekistan ruling family sought to compel Interspan to surrender its assets by arresting or threatening to arrest Interspan personnel.  Interspan has asserted facts about the legal and prison system in Uzbekistan showing that arrest and detention posed a significant threat of physical injury.  Interspan has alleged facts showing that the prospect of arrest, or, for those already arrested, the prospect of continued detention, posed a risk of bodily injury.  Liberty inaccurately characterizes the allegations regarding the denial of medical treatment to Mikhail Matkarimov as simply "an allegation that something occurred, not that something was threatened."  The threat alleged in the complaint is that the

government would continue to hold Matkarimov in harsh conditions and without needed medical care until Interspan surrendered its business and business assets. Interspan has made specific factual allegations showing how an implicit threat of bodily injury was made against Eskender Kiamilev, Natasha Matkarimova, Mikhail Matkarimov, Eric Johnson, and Emir Kiamilev. These allegations are sufficient to withstand a motion to dismiss. *See Phillips*, 515 F.3d at 234.

### B.    Loss

Liberty asserts there was no "loss" due to threats made against Interspan because Interspan did not voluntarily surrender its assets; those assets were seized by the government or appropriated by other entities. (Docket Entry No. 19 at 8). "Loss" is defined as the "sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the Insured as a ransom or extortion payment." The complaint alleges that CRI warned Interspan that if its principals, Johnson and Emir Kiamilev, returned to Uzbekistan to try to continue doing business, they would be arrested on criminal charges and face the threat of bodily injury. Interspan alleges that CRI instructed it that Interspan would have to surrender its business and business assets in exchange for Matkarimov's release. "Based on that threat, and on Interspan's understanding of the demands regarding Mr. Matkarimov, Mr. Johnson and Mr. Kiamilev did not return and, instead, surrendered all of Interspan's business assets in Uzbekistan. Interspan's assets were ultimately taken over by companies reported to be controlled by Gulnara Karimova and her Business associates." (Docket Entry No. 1, ¶ 113). The complaint alleges that Matkarimov was released only after Karimova and those related

to her took over all of Interspan's business operations and assets and points out that Matkarimov was granted amnesty within two months of his conviction. (*Id.*, ¶¶ 115–16).

Liberty contends that Interspan's allegations that it surrendered its assets because of threats made by the government are inconsistent with its claim that its physical property had been physically seized when Eskender Kiamilev was arrested, that the criminal judgment against Matkarimov formally stripped Interspan of its legal ownership of the seized assets, some of which had already been sold, and that Interspan's remaining assets, including its distribution network, intellectual property, and goodwill, were appropriated by other entities. Interspan does not dispute that much of its physical business assets had been seized and appropriated even before Matkarimov was released from detention. Interspan alleges that the facts surrounding Matkarimov's release and the instructions from CRI that Interspan's principals should not return to Uzbekistan to continue operating the business show that the relinquishment of the business assets and operations was the price for Matkarimov's release. The complaint alleges that Interspan surrendered its assets in response to the threats of arrest, detention, and criminal prosecution that were part of an effort to dismantle Interspan's business operations. The allegations of "loss" are sufficient to allow the suit to proceed.

## V.    Legal/Medical Expense Coverage

The policy also provides coverage for "Legal/Medical Expenses," which it defines to include "legal judgments . . . incurred by the INSURED based on or arising out of incidents insured by this Policy. . . ."  Liberty argues that Interspan has failed to plead facts that would support a recovery under this provision with respect to the legal judgment against

29

Matkarimov because it has failed to make the predicate showing that his arrest and prosecution were covered under Hazards 1 or 2, or that the judgment forfeiting Interspan's assets was based on or arose from an incident covered by Hazards 1 or 2.  As discussed above, Interspan has pleaded facts showing the basis for contending that the arrest and prosecution of Matkarimov was covered under Hazards 1 and 2.  Interspan has pleaded that it surrendered the seized assets that were the subject of the legal judgment by declining to take actions to recover the seized property and by ceasing its business operations in Uzbekistan.  Interspan has pleaded facts supporting its claim that the judgment forfeiting Interspan's assets was based on or arose from an incident covered by Hazards 1 or 2.  The motion to dismiss on this basis is denied.

## VI.    Conclusion

Liberty's motion to dismiss is denied.

SIGNED on March 31, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge