**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

INTERSPAN DISTRIBUTION CORP.,    §
                                 §
            Plaintiff,           §
                                 §
V.                               §    CIVIL ACTION NO. H-07-1078
                                 §
LIBERTY INSURANCE                §
UNDERWRITERS, INC.,              §
                                 §
            Defendant.           §

**MEMORANDUM AND ORDER**

The events involved in this case read more like a movie plot than the background facts of an insurance coverage dispute.  The arrests, detention, and trial of individuals in Uzbekistan allegedly led their relatives, principals in a tea-import business based in Houston, to abandon that business and its assets. The company, Interspan Distribution Corp., claimed insurance benefits for the business assets and interests lost in Uzbekistan.  Interspan asserted its claim under the "Extortion Bodily Injury" hazard of a Special Coverages Policy issued by Liberty Insurance Underwriters, Inc. Interspan claimed that in 2006, its Uzbekistan tea-importation business was the target of a scheme, orchestrated by members of one of Uzbekistan's most powerful families who were also in the tea business, to force Interspan to stop doing business in that country and to abandon the assets located there.  Liberty denied coverage.  This litigation resulted.

The following motions are pending:

- Interspan has moved for partial summary judgment that it is entitled to coverage under Hazard 2 (Extortion Bodily Injury) and to Additional Coverage for related "legal judgments." (Docket Entry No. 32). Liberty has responded, (Docket Entry No. 54), and filed objections to certain of Interspan's summary judgment evidence, (Docket Entry No. 56).  Interspan

has replied,  (Docket Entry No. 62), and filed a supplemental memorandum of law, (Docket Entry No. 82).

• Interspan has filed a motion *in limine* to preclude all evidence that Liberty adduced after denying coverage to Interspan.   (Docket Entry No. 68). Liberty has responded. (Docket Entry No. 78).

• Interspan has filed a motion *in limine* to preclude all evidence suggesting that Interspan should have purchased political risk insurance.  (Docket Entry No. 70).  Liberty has responded. (Docket Entry No. 79).

• Interspan has filed a motion *in limine* to preclude all evidence from Liberty relating to a purported side agreement between Interspan and Charles Rudd. (Docket Entry No. 72).  Liberty has responded.  (Docket Entry No. 80).

• Liberty has cross-moved for partial summary judgment that Interspan is not entitled to coverage under Hazard 1 (Kidnap/Ransom) of the Special Coverages Policy.  (Docket Entry No. 34).  Interspan has responded by withdrawing its claim under Hazard 1 "because it believes that the Liberty Policy's Extortion Bodily Injury coverage is broader than its Kidnap/Ransom coverage."  (Docket Entry No. 46).

• Liberty has cross-moved for partial summary judgment that Interspan is not entitled to coverage under Hazard 2 (Extortion Bodily Injury) of the Special Coverages Policy.  (Docket Entry No. 35).  Interspan has responded. (Docket Entry No. 48).

• Liberty has cross-moved for partial summary judgment that Interspan is not entitled to Additional Coverage for "legal judgments" under the Special Coverages Policy.  (Docket Entry Nos. 36, 37).  Interspan has responded. (Docket Entry No. 48).

• Liberty has cross-moved for partial summary judgment that the act-of-state doctrine precludes coverage.   (Docket Entry No. 39).   Interspan has responded, (Docket Entry No. 50), and Liberty has replied, (Docket Entry No. 85).

• Liberty has cross-moved for partial summary judgment that Corporate Risk International ("CRI"), which provided crisis-response services after the arrests and detentions in Uzbekistan, was not Liberty's agent, and that Charles Rudd, who investigated the arrests and detentions in Uzbekistan on CRI's behalf, was not CRI's agent. (Docket Entry No. 40).  Interspan has responded, (Docket Entry No. 52), and Liberty has replied, (Docket Entry No. 86).

2

Based on the pleadings; the motions, responses, and replies; the summary judgment record; and the applicable law, Interspan's motions for partial summary judgment and motions in limine are denied.  Liberty's cross-motions for partial summary judgment are granted as to the lack of coverage under Hazard 1 and as to agency, and otherwise denied.  Liberty's evidentiary objections are overruled.  A scheduling conference is set for **September 17, 2009, at 9:00 a.m.** in Courtroom 11-B.

The reasons for these rulings are set forth below.

## I.   Background

### A.   The Cast of Characters

To reduce confusion, it is helpful to provide a cast of characters.  A list of those central to the plot, and a brief description of each individual or entity, is set out below.

#### 1.   *Interspan*

- Eric Johnson: A principal of Interspan and of Centrax International, which held a 50% stake in Interspan.  Johnson lived in The Woodlands, Texas when the incidents in this suit occurred.  Johnson lived in Uzbekistan doing Interspan business between about 2001 and 2004.

- Emir Kiamilev: An Interspan principal and 50% Interspan stakeholder.  Kiamilev lived in San Diego, California when the incidents in this suit occurred.  Kiamilev lived in Uzbekistan after Interspan was founded until about 2004.

- Eskender Kiamilev: Emir Kiamilev's father.  Eskender Kiamilev worked in Uzbekistan between 2001 and 2006 to oversee Interspan's business.  Eskender Kiamilev was arrested in Uzbekistan on February 13, 2006 and released to the United States on February 21, 2006.

- Bakhrom Khakimov: Interspan's manager in Uzbekistan.  Khakimov was third-in-charge of the business after Eric Johnson and Emir Kiamilev.

- Mikhail Matkarimov: Eric Johnson's brother-in-law.  Matkarimov leased and managed Interspan's warehouses in Keles, Uzbekistan.  Mikhail Matkarimov was

3

arrested in Uzbekistan on February 24, 2006 and detained, tried, and convicted of criminal commercial practices.  He was released on August 11, 2006.

- Natasha Matkarimov: Mikhail Matkarimov's wife and the sister of Eric Johnson's wife.

- Sergey Matkarimov: Mikhail Matkarimov's brother.  Sergey Matkarimov was involved in security and distribution for Interspan.

- Furkhat: A customs broker who worked on retainer for Interspan in Tashkent, Uzbekistan.

- Famous Brands Tea Company: Interspan's shipping agent in Dubai. Famous Brands had the same shareholders, in the same percentages, as Interspan.

- Centrax International: A 50% shareholder in Interspan.  Eric Johnson, his father, Mike Johnson, and Larry Crews were principals.

   *2.     Liberty, CRI, and PIA*

- Liberty Insurance Underwriters, Inc.:  The insurer issuing the Special Coverages Policy.

- Professional Indemnity Agency ("PIA"):  PIA quoted and bound insurance, contracted with reinsurers and crisis response firms, and issued policies in Liberty's name.  PIA, with the reinsurers, was responsible for investigating claims under the Special Coverages Policy.

- Corporate Risk International ("CRI"): A crisis-response firm that worked on a semi-exclusive basis with PIA to provide crisis-response services to insureds.  CRI was named in the Special Coverages Policy as the entity to which loss should be reported. CRI responded to Interspan's request for assistance in Uzbekistan.

- Unity Resources Group ("URG"):  A risk consulting group headquartered in Dubai. CRI asked Unity Resources Group to find a consultant in Uzbekistan who could assist CRI with Interspan's situation in Uzbekistan.

- Albert ("Bert") Van Wagenen:  The division manager for the kidnap/ransom and extortion coverage lines at PIA.  Van Wagenen received reports from CRI about Eskender Kiamilev's and Mikhail Matkarimov's arrests.

- Buck Kidder: Another PIA employee. Kidder, with Van Wagenen, decided that CRI could respond to the arrests of Eskender Kiamilev and Mikhail Matkarimov but that CRI would not be permitted to assist Interspan in recovering its lost assets.

4

- Richard Hildreth:  The senior vice-president of CRI's crisis-management services. Hildreth was responsible for coordinating CRI's efforts in Uzbekistan for Interspan.

- Mike Fiacco:  A member of URG who recommended a consultant in Uzbekistan that could assist CRI in Uzbekistan.

- Charles Rudd:  An American businessman living permanently in Uzbekistan.  Mike Fiacco of URG recommended Rudd to CRI as a person who could assist with CRI's response in Uzbekistan.  Rudd was not employed by URG, but his contracting services for CRI were billed through URG.

- John L. Wortham:  The broker who sold the Special Coverages Policy to Interspan.

- Richard F. Roarke:  The attorney who prepared the denial of Interspan's claim for Liberty and PIA.

   *3.     Uzbekistan*

- Uzbegim:  One of Interspan's importers in Uzbekistan.  Uzbegim was an umbrella entity for a numerous businesses, including real estate, retail, and other companies. Several Uzbegim-related companies, including J.V. Trade and Production International, Farmers, and Avileasing, were also involved in importing tea for Interspan.

- Khurshid:  A manager for Uzbegim and Interspan's chief contact at Uzbegim.

- Takhir:  A friend of Emir Kiamilev's who worked in the Tashkent, Uzbekistan prosecutor's office.

- Vissaryon Lee:  One of Rudd's legal contacts in Uzbekistan.

- Arustamov:  Another of Rudd's legal contacts in Uzbekistan.  Arustamov was a former prosecutor in Tashkent, Uzbekistan.

- Venir:  Mikhail Matkarimov's attorney after the arrest.

- Gulnara Karimova:  The daughter of Islam Karimov, President of Uzbekistan.

- Mirabror Usmanov:  A former Minister of Trade and former Deputy Prime Minister of Uzbekistan.  Usmanov was the beneficial owner of the Samarqand Tea company, which packaged and sold bulk tea in Uzbekistan.

- Beta Tea:  Another tea company that sold packaged tea in Uzbekistan.  Beta had a larger share of the packaged-tea market than Interspan.

5

### B.      The Summary Judgment Record

The parties have submitted extensive summary judgment evidence.   The exhibits include a copy of the Special Coverages Policy, number 180472-013, (Docket Entry No. 32, Ex. 1-A).  The record also includes evidence as to the relationship among Liberty, the Professional Indemnity Agency (PIA), and Corporate Risk International (CRI).  This evidence includes a March 3, 1993 agreement between PIA and CRI, retaining CRI's services, (Docket Entry No. 52, Ex. 4); a March 2, 2005 Standard Letter of Authority from Liberty, stating that it had given authority to PIA "to act as our Agent to underwrite insurance business on our behalf," (Docket Entry No. 52, Ex. 1); and a January 1, 2006 Managing General Agency Agreement between Liberty and PIA, (Docket Entry No. 52, Ex. 2).

There are a large number of documents that describe Interspan and its business in Uzbekistan.[1]  These documents include invoices and payments for tea Interspan imported into Uzbekistan.[2]  Another category of documents includes email and other communications involving the arrests, detentions, and release of the relatives of the Interspan principals.[3]  Another category

---

[1]  These documents include a chart titled "Interspan Profit & Loss" for the year ending December 31, 2002, (Docket Entry No. 46, Ex. 2-A), a balance sheet for Interspan dated December 31, 2002, (*id.*), and an August 10, 2005 email from Interspan principal Emir Kiamilev to Interspan principal Eric Johnson entitled "Interspan Distribution Slide Show," attaching a presentation and a proposed Strategy Articulation Map for the company, (Docket Entry No. 54, Ex. D-150).

[2]  Docket Entry No. 46, Ex. 2-A.

[3]  These emails and communications began in February 2006 and were exchanged among Eric Johnson, Emir Kiamilev, Bakhrom Khakimov, Richard Hildreth, Bert Van Wagenen , Mike Fiacco, Charles Rudd, John L. Wortham, and Mike Johnson and Larry Crews (principals of Centrax International). These emails refer to "Operation 'Kick,'" the name given to CRI's investigation of the arrest of Eskender Kiamilev, and to "Operation Kick II," the name given to the investigation of the arrest, indictment, and conviction of Mikhail Matkarimov.  (Docket Entry No. 32, 48, 54).

includes background documents on the political, business, and legal situation in Uzbekistan.[4]

Another category consists of correspondence relating to Interspan's claim for insurance benefits and

Liberty's response.[5]   The parties have also submitted excerpts from the depositions of Mark

McDougall,[6] Richard Hildreth;[7] Robert F. Roarke,[8] Eric Johnson,[9] Emir Kiamilev,[10] and Albert Van

Wagenen.[11]

---

[4]  This category includes a March 22, 2002 article by Gregory Feiner for the World Policy Journal titled "Uzbekistan's eternal realities: a report from Tashkent," (Docket Entry No. 32, Ex. 2-E); a July 31, 2004 article by DEBRA-Net-Weekly titled "Three Groups Take Aim at Uzbekistan's Secular Regime." (*Id.*, Ex. 2-I); a June 24, 2005 article by TA titled "Gulnara Karimova has created a parallel power system in the country," (*Id.*, Ex. 2-H); a September 2005 article by Human Rights Watch titled "Burying the Truth: Uzbekistan Rewrites the Story of the Andijan Massacre," (*Id.*, Ex. 2-C); a September 21, 2005 article by Bruce Pannier for Radio Free Europe titled "Uzbekistan: Andijon Trial Follows Well-Established Pattern." (*Id.*, Ex. D). a 2006 article by Freedom House titled "Nations in Transit–Uzbekistan," (*Id.*, Ex. 2-G); a March 8, 2006 release from the U.S. Department of State Bureau of Democracy, Human Rights, and Labor titled "Uzbekistan; Country Reports on Human Rights Practices–2005." (*Id.*, Ex. 2-A); and a November 8, 2005 article by APEHA titled "National Security Service of Uzbekistan 'neutralizes' Sunshine Coalition oppositionists," (*Id.*, Ex. 2-F).

[5]  This category includes Interspan's June 9, 2006 claim demand and August 21 and September 8, 2006 letters from counsel for Liberty and PIA to counsel for Interspan denying coverage for the Eskender Kiamilev and Mikhail Matkarimov incidents.  (Docket Entry No. 32, Exs. 1-L, 1-M, 2-W).

[6]  Interspan has introduced numerous excerpts from McDougall's deposition but has not identified McDougall's employer or position.  The excerpts show that McDougall was involved in the decision to deny Interspan's claim.  Docket Entry No. 46, Exs. 1-G, 1-H; Docket Entry No. 48, Exs. 1-P, 1-Q, 1-R, 1-S, 1-T, 1-U, 1-V, 1-W, 1-X, 1-Y, 1-Z, 1-AA, 1-BB, 1-CC, 1-DD, 1-EE, 1-FF, 1-GG, 1-HH, 1-II, 1-JJ, 1-KK, 1-LL, 1-MM, 1-NN, 1-AAA; Docket Entry No. 50, Exs. 1-H, 1-I, 1-J, 1-K, 1-M; Docket Entry No. 52, Exs. 6, 7, 8, 11; Docket Entry No. 62, Exs. A, B, C, E, Q.

[7]  Docket Entry No. 54, Exs. A, B.

[8]  Docket Entry No. 48, Ex. 1-ZZ; Docket Entry No. 50, Ex. 1-L.

[9]  Docket Entry No. 54, Ex. C.

[10]  Docket Entry No. 54, Ex. D.

[11]  Docket Entry No. 32, Ex. 2-Z; Docket Entry No. 46, Ex. 1-F; Docket Entry No. 48, Ex. 1-OO, 1-PP, 1-QQ, 1-RR, 1-SS, 1-TT, 1-VV, 1-WW, 1-XX, 1-BBB, 1-CCC, 1-DDD; Docket Entry No. 50, Exs. 1-A, 1-B, 1-C, 1-D, 1-E, 1-F, 1-G; Docket Entry No. 52, Exs. 5, 17; Docket Entry No. 62, Exs. D, U; Docket Entry No. 82, Ex. C.

### C.    The Special Coverages Policy

Liberty issued Special Coverages Policy number 180472-013 to Interspan on June 20, 2003. The effective dates were June 23, 2003 through June 23, 2006.  The Policy had a $5 million limit for "each loss" and no deductible.  Coverage was worldwide.  The Policy provided for the insured to give "notice of loss" at a specified address to Corporate Risk International ("CRI"), a crisis-response company.  (Docket Entry No. 32, Ex. 1-A at 1).

The Special Coverages Policy provided coverage for four hazards.  Interspan relies on Hazard 2, which covered "LOSSES" caused by "Extortion Bodily Injury."   Hazard 2 stated:

> Extortion Bodily Injury:
> by reason of the receipt of a threat, communicated directly or indirectly to the INSURED to kill, injure or KIDNAP an Insured Person, RELATIVE OR GUEST . . . .

(*Id.*, Ex. 1-A at 15).  The relevant Policy definitions are:

- "LOSS":   "the sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the INSURED as a ransom or extortion payment arising from one event or connected series of events involving one or more Insured Persons, RELATIVES or GUESTS."  (*Id.*, Ex. 1-A at 16).

- "KIDNAP or KIDNAPPING":   "the involuntary abduction of an insured person, RELATIVE, or GUEST and the holding of such person by persons who demand money or other consideration in exchange for the release of the captive person." (*Id.*, Ex. 1-A at 20).

- "RELATIVE":  includes "an Insured Person's: spouse, siblings, brothers-in-law, sisters-in-law, [and] living ancestors . . . ."  (*Id.*, Ex. 1-A at 19–20).

The Policy did not provide definitions for "extortion" or "threat."

The Policy also provided "Additional Coverage" for "Legal/Medical Expenses" resulting from the occurrence of an insured hazard.  Legal/Medical Expenses include "legal judgments . . .

incurred by the INSURED based on or arising out of incidents insured by this Policy. . . ."  (*Id.*, Ex. 1-A at 18).

Interspan is not seeking coverage under Hazard 3, which provides coverage for "LOSS" resulting from the "DETENTION of an Insured Person, RELATIVE or GUEST."  But Interspan argues that Hazard 3 shows that the Policy "contemplate[s] and provide[s] coverage for losses arising from government officials" that are arguably covered by the "act-of-state" doctrine. (Docket Entry No. 50 at 12).  Hazard 3 provides:

> Detention:
> by reason of a DETENTION of an Insured Person, RELATIVE or GUEST first occurring during the Policy period; provided that, as respects Hazard 3, the Company shall not be liable for:
>
> 1)      any DETENTION resulting from:
>
> a)      any violation or alleged violation of the laws of a host country by the INSURED or Insured Person(s), RELATIVE or GUEST, or
>
> b)      failure of the INSURED or an Insured Person, RELATIVE or GUEST to maintain and possess duly authorized and issued required documents and visas
>
> unless the Company shall determine such allegations were intentionally false, fraudulent and malicious and made solely to achieve a political, propaganda and/or coercive effect upon or at the expense of the Named Insured, Insured Person, RELATIVE or GUEST.

(*Id.*, Ex. 1-A at 15–16).  "DETENTION" is defined as "an arbitrary and capricious act of involuntary confinement of an Insured Person, RELATIVE or GUEST."  (*Id.*, Ex. 1-A at 20).

The Policy also contains a "Collusion or Fraud" exclusion for "LOSS and/or expense due to fraudulent, dishonest or criminal act by an Insured Person, RELATIVE, GUEST or authorized

9

representative (whether acting alone or in collusion with others) unless the person authorizing payment of the LOSS and/or expense had, prior to payment, made every reasonable attempt to determine that the ransom demand or threat was genuine." (*Id.*, Ex. 1-A at 22).

### D.     The Relationship Among Liberty, PIA, and CRI

Under a March 3, 2002 Standard Letter of Authority, Liberty gave PIA authority "to act as [Liberty's] Agent to underwrite insurance business on [Liberty's] behalf." (Docket Entry No. 52, Ex. 1). Liberty and PIA entered into a Managing General Agency Agreement for the administration of "Special Contingencies Insurance" on January 1, 2006. Special Contingencies Insurance includes but is "not limited to Kidnap and Ransom, Extortion, Detention and extensions of coverage thereto." Under the Managing General Agency Agreement, PIA was authorized to solicit customers, quote and collect premiums, and bind policies for Liberty. PIA was also responsible for selecting, retaining, and paying a crisis-response team to respond to events arising under the policies. (Docket Entry No. 52, Ex. 2). Albert ("Bert") Van Wagenen was the division manager for the kidnap/ransom and extortion coverage lines at PIA. (Docket Entry No. 48, Ex. 1-BBB at 9).

PIA and CRI entered into a March 3, 1993 Agreement under which CRI would "supply appropriate man-power to respond and render consulting services upon the request of PIA, its clients, [and] insureds . . . immediately upon receipt of notice furnished by PIA . . . [or] the policyholder." (Docket Entry No. 52, Ex. 4 at 6). The 1993 Agreement required CRI "[t]o provide and be responsible for the operation of a continuously manned . . . telephone answering and response system" for PIA and insureds and "[t]o provide all means necessary (including the retainage of competent experienced contract personnel) to provide the highest degree of expeditious and professional response." (*Id.*, Ex. 4 at 3). An exclusivity provision in the 1993 Agreement required

CRI to "refrain from rendering consulting or response services to any kidnap, ransom, extortion, [or] . . . detention victim" insured by any other insurer, although CRI may provide such services to uninsured victims.  (*Id.*, Ex. 4 at 7–8).  Under the 1993 Agreement, CRI received 3½% of net cash premiums collected by PIA, plus a $1,000 "per man" per diem for the first 45 days of any covered incident and $750 per man per diem thereafter, plus expenses.  The 1993 Agreement also entitled PIA to fifteen days of free services from a CRI agent of PIA's choice to make presentations and meet with prospective clients, brokers, intermediaries, underwriters, syndicates, and insurers.  (*Id.*, Ex. 4 at 9–10, 13).

In another case discussing a "kidnap and ransom" insurance policy issued by PIA for which CRI served as the crisis-response group, the court explained the relationship between PIA and CRI:

> To avoid the appearance that Underwriters placed their economic interest over the interests of a hostage, the Policy provides that the Underwriters will not be involved in the day-to-day handling of any kidnapping and will not make any substantive decisions regarding strategy or the payment of ransom.  Instead, the Policy provides that in the event of a kidnapping, Corporate Risk International (CRI), a crisis management company, will advise and assist [the insured] in the negotiations for the release of the hostage.

*Hargrove v. Underwriters at Lloyd's, London*, 937 F. Supp. 595, 598 (S.D. Tex. 1996).

Richard Hildreth, the senior vice-president of CRI's crisis-management services, testified in his deposition that neither Liberty nor PIA controls the details of how CRI responds to an incident.  CRI notifies PIA when it receives a claim, to confirm that the insured has a policy in place.  CRI does not see its customers' insurance policies and does not make coverage decisions.  (Docket Entry No. 54, Ex. A at 10–20).  Hildreth testified that CRI responds if a policyholder asks and "nobody tells us not to."  (*Id.*, Ex. A at 120).  CRI does provide regular updates to PIA while working for an insured.          ʻ

11

### E.      Interspan

Interspan was formed around January 1998 by Emir Kiamilev and Eric Johnson, who lived and worked in the United States when the incidents alleged in this suit occurred.  Kiamilev owned 50% of Interspan and concentrated on marketing and strategy.  Johnson was a principal in another company called Centrax International Distribution,  which owned the other 50% of Interspan.  Eric Johnson; his father, Mike Johnson; and Larry Crews were members of the Centrax board.  (Docket Entry No. 54, Ex. C at 177–78).

Interspan was incorporated in the Bahamas and registered to do business in Dubai.  Interspan was not registered to do business in Uzbekistan.  (Docket Entry No. 32, Ex. 1-C; Docket Entry No. 54, Ex. C at 20–21).  Interspan's business was importing packaged tea into Uzbekistan.  Interspan had imported bulk tea and packaged it inside Uzbekistan between about 2001 and 2003, but abandoned this part of the business because of changes to Uzbekistan's tax laws.  Interspan still had equipment from its packaging operations in storage in Uzbekistan when the incidents alleged in this suit occurred.  (Docket Entry No. 54, Ex. C at 11–19, 39–42).

In 2005 and 2006, Interspan had three tea suppliers:  Akbar Brothers in Sri Lanka (which supplied Interspan's Akbar and Tashkent Tea brands);  Imperial ("Impra") Teas in Sri Lanka; and Silk Teas in China.  Interspan imported tea from these suppliers through the Famous Brands Tea Company, Interspan's shipping agent in Dubai.   Famous Brands was owned by the same shareholders as Interspan.

Bakhrom Khakimov, Interspan's manager in Uzbekistan, was responsible for ordering tea from the suppliers.  Bakhrom sent monthly spreadsheets to Johnson and Kiamilev setting out the

dates that containers of tea were ordered, invoice numbers, and payment dates.  (Docket Entry No. 49, Ex. D at 19–31, 104).

The suppliers shipped the tea to Dubai and then to Tashkent, Uzbekistan.  The tea would arrive in Uzbekistan through a customs-bonded warehouse.  A customs broker named Furkhat was responsible for clearing the tea through customs by paying the taxes and duties.  Furkhat received a retainer, not a salary, and did not work directly for Interspan.  Furkhat also worked as a customs broker for other entities.  The tea was cleared through customs in the name of Interspan's importers, which Interspan referred to as "ChPs" or "patents." (Docket Entry No. 54, Ex. D at 37–50).  The transactions were documented as between Famous Brands and the ChPs; Interspan's name did not appear on the import documents.

After the tea cleared customs, the ChPs transported the tea to warehouses in Keles, Uzbekistan.  The warehouses were leased and managed by Mikhail Matkarimov, Eric Johnson's brother-in-law.  Some of the tea was sold in Keles and some went to "Urukzor," a wholesale bazaar, or to a "distribution warehouse" for sale.  The ChPs sold the tea to wholesalers at prices set by Interspan.  According to Johnson, the tea was "consigned" to the ChPs because Interspan technically retained title until it was sold to the wholesalers.  (Docket Entry No. 54, Ex. C at 39–40).  But the official documents showed that the ChPs owned the tea.  (*Id.*, Ex. C-104).  The ChPs would retain a monthly fixed amount from their sales as compensation.  Tea sales in Tashkent were primarily cash transactions.  Interspan set the price at which the ChPs could sell the tea.  (*Id.*, Ex. D at 51–56).

Emir Kiamilev testified that Interspan "underinvoiced" its tea imports, meaning that the tea was declared at customs for less than the prices at which it was purchased and sold.  Kiamilev testified, however, that underinvoicing was proper—even required—under Uzbekistan law.

13

Kiamilev testified that imported tea was declared at customs at "customs base," a price set by the Uzbekistan government. The customs base "was lower than the actual price." According to Kiamilev, the difference between the customs base and the actual price of the tea was "huge." Kiamilev testified that the Uzbek government required underinvoicing tea and other imports "to limit the[ ] outflow of [hard] currency." Interspan's ChPs paid Famous Brands directly for the amounts declared at customs and Famous Brands forwarded the funds to an Interspan bank account in Germany. Transferring the amounts paid above the "customs base" was more complicated. Kiamilev testified that Interspan's ChPs would use the money received from sales above the customs base to purchase Uzbek commodities for export. Purchasers of those exports would then forward their payments for those commodities to Interspan. (*Id.*, Ex. D at 128–140, 153–56). The evidence does not show whether the system Kiamilev described was legal in Uzbekistan.[12]

A company called Uzbegim was one of Interspan's importers. Uzbegim was an umbrella entity for a "multitude of businesses," including real estate, retail, and other companies. Uzbegim directed its companies—including J.V. Trade and Production, International; Farmers; and Avileasing—to import Interspan's tea. Interspan primarily dealt with Uzbegim through a man named Khurshid. (*Id.* at 47–70, 81–82). Emir Kiamilev's father, Eskender Kiamilev, worked in Uzbekistan from approximately 2001 to 2006 to oversee Interspan's business, including overseeing payment by the ChPs. Eskender was in Uzbekistan on a work visa obtained by Uzbegim. Eskender Kiamilev could not get a work visa through Interspan because it was not registered to do business

---

[12]   Johnson stated in his deposition that the authorities who arrested Kiamilev and Matkarimov made the "ridiculous accusation" that Interspan "brought cheap tea . . . under invoice and sold the tea at five times the value of the tea." Johnson also testified, however, that he understood that Uzbek customs authorities set the price of imports themselves as a matter of law, so importers did not have the option of clearing the imports at higher or lower amounts. (*Id.*, Ex. C at 160–62).

in Uzbekistan. Eskender Kiamilev did not receive a salary from Uzbegim but drew a $3,000 monthly salary from Interspan. (*Id.* at 71–80; Docket Entry No. 32, Ex. 2-W).

On August 10, 2005, Emir Kiamilev sent Johnson a document titled "Interspan Distribution" and asked for Johnson's input. The document described Interspan as a "fully integrated tea company" with 80 employees, involved in importing, packaging, and distributing tea. The document stated that Interspan's "sales over the last 2.6 years ha[d] been stagnant and in an overall downtrend," although "[r]epayment of debt, lower costs, [and] creative management ha[d] allowed Interspan's net assets to grow." The document described a "slow deterioration" driven by sales teams not "understand[ing] the relationship between their success and the compan[y]'s success." The document recommended "weed[ing] out non-performing unqualified workers," "chang[ing] the compensation system," "restructur[ing] the routes," and "[i]ncentiviz[ing] re-sellers to display Interspan products properly." (Docket Entry No. 54, Ex. D-150). Emir Kiamilev testified that this document was a rough draft prepared as part of a group project for his executive MBA program at Wharton business school. The assignment was to restructure Interspan's distribution network. Eskender Kiamilev testified that the document might not have been an accurate description of Interspan's business situation or condition. (*Id.*, Ex. D at 14–17, 83–84).

The record shows that Interspan's principals contemplated selling all or a portion of the business in November 2005. An email from Johnson to Emir Kiamilev stated:

> I've been speaking with the Almaty Tea Factory owner. And, he does have an interest in either purchasing our business straight out or, purchasing a percentage of our business. They have been looking to enter the Uzbek market, and believe that it might make sense to purchase our brand vs. starting a new one. And, they think that with the new customs laws, they can get an advantage by packing in Kazakhstan.

What I need to know from you is:

\* Are you interested in selling just a percentage of the business?  I assume yes, if the price is right.

\* What is the total price that you are interested in selling for?  We mentioned 1 times revenues . . . I think that's a good starting point to ask, but I don't think it is realistic . . . with assets, that would put the price around $6 Mill.  Obviously, that's a crazy number.  I think that ½ times sales plus assets would be more realistic.  What's your price?

(Docket Entry No. 54, Ex. C-59).  Emir Kiamilev responded later that day:

1) Selling a % of the business
[S]elling a percentage of the business would really complicate things. For example, there would automatically be restrictions on management salaries, etc.  I am sure that we will definitely lose our freedom in operating the company.  So, I don't see how gaining a new partner will help us, unless of course like you say that the price is right.  This is the least favorable option for me.  But, I am open for suggestions, if the price is right.

2) Price of the company
I think that ½ times sales revenue is more than enough.  This means 2 mil/piece.  I will take that anyday . . .  However, we need to make it clear that we are not interested in just selling Tashkent brand, it is a package (the whole company w/ employees).  The reason I say this, is because the business is not feasible w/o Tashkent.

(*Id.*).

## F.    Eskender Kiamilev's Arrest and Release

On February 8, 2006, Emir Kiamilev emailed Bakhrom, Interspan's manager in Uzbekistan, stating that Eskender Kiamilev (Emir Kiamilev's father), had warned about "unknown vehicles" following Interspan personnel in Tashkent.  Commenting that "[t]his is really worrying me," Emir Kiamilev instructed Bakhrom to take the following steps:

16

1)      Make sure you clean out all offices of all information that can link us in any way. Especially, make sure that we don't have any financial data anywhere in the office.

2)      I think that it is very wise to separate our inventory into three different warehouses.   Uzbegim   warehouse/Tijorat warehouses are a good idea.  If our inventory gets hit, there will be no recovering.  Even if this costs us more money, we have too much concentrated in one place.

3)      Are you sure that all reports that you send are not being intercepted.  I think it is better to take all pre-cautions in sending reports.    And, DO NOT SEND SCANNED REPORTS (THAT IS AN ORDER).

And, take any outer pre-cautions that you think might need to be taken in case of planned raid.

(Docket Entry No. 54, Ex. D-188).  Emir Kiamilev testified that he was concerned because during the time that Interspan had operated in Uzbekistan, there had never been "anyone follow[ing] any of [its] cars or anything like that."  Kiamilev thought that "it was either criminals or competition" and was not concerned about a raid by government agents.  Kiamilev testified that he did not want anyone to "link all of the ChPs together" because it was a "proprietary network."  He was also worried that the financial documents would show where Interspan's cash and inventory were located.  (*Id.*, Ex. D at 177–79).

On February 13, 2006, Eskender Kiamilev, his driver, and his two bodyguards, were taken into custody by armed police or military personnel and transported to a holding facility.  Eric Johnson reported the arrest to Hildreth at CRI on February 16, 2006.  Hildreth in turn reported his conversation with Johnson to Bert Van Wagenen at PIA:

[Johnson] advised that he has learned that reportedly the force behind this apprehension of Kiamilev is the daughter of the President of Uzbekistan, and that there have been other similar incidents involving U.S. corporations. [Johnson] advised that over the last three days he

17

has learned that the aforementioned, alleged Uzbekistanian authorities have raided Interspan's office/warehouses in Tashkent; seized all computers and other company equipment; arrested a large number of Interspan's employees (20+); and that a number of employees are currently in hiding from the police. [Johnson] advised that the authorities also raided Kiamilev's residence and trashed it along with seizing some of his property.

(Docket Entry No. 32, Ex. 2-J). Hildreth also reported that Eskender Kiamilev's passport had been

seized and that the head consul of the U.S. Embassy in Tashkent, John Ballard, had been contacted.

(*Id.*).[13]

After receiving notice of Eskender Kiamilev's arrest, Hildreth contacted Mike Fiacco at

Unity Resources Group, with whom CRI had dealt "for some time," to see whether Fiacco "knew

anyone in Uzbekistan that might be in a position to find out what had happened in connection with

an incident."  Fiacco responded that he "knew of an individual by the name of Charles Rudd that

was permanently living in Uzbekistan" and would "probably be able to assist [CRI] and . . . report

back what was going on over there so that [CRI] could give [Interspan] the information."  Hildreth

retained Rudd's services on behalf of CRI.  Rudd's services were billed through the Unity Resources

---

[13] Liberty objects to an affidavit statement by Johnson that "Interspan was advised that in conjunction with Eskender Kiamilev being taken into captivity, certain of its physical property, including an inventory of tea, was seized."  Liberty contends that the statement is "hearsay and conclusory" and the actual loss of the tea lacks "documentary evidence." (Docket Entry No. 56 at 2).  These objections are not a basis for excluding evidence submitted not to show whether it was true, but to show what was presented to and considered by Interspan.  *See Snyder v. Whittaker Corp.*, 839 F.2d 1083, 1090 (5th Cir. 1988) ("[A] statement does not fall under the hearsay rule if it was offered, not to prove the truth of the matter asserted . . . but to prove that the statement was made.").

Liberty also objects to the introduction of the February 16, 2006 memorandum from Hildreth to Van Wagenen as being "not properly authenticated" and "recount[ing] events which have been reported by an unknown source at Interspan to an unknown person at CRI."  (Docket Entry No. 56 at 9). Liberty's objection is overruled.  Liberty does not dispute that it produced this document.  This is sufficient for authentication. *See Pierre v. RBC Liberty Life Ins.*, No. Civ. A. 05-1042, 2007 WL 2071829, at *2 (M.D. La. July 13, 2007) ("When a party has produced the document in question in response to a subpoena or discovery request, he has implicitly authenticated the document and it can therefore be considered in evaluating a summary judgment motion." (internal citation omitted)).

18

Group, although Rudd communicated with CRI directly.  (Docket Entry No. 54, Ex. A at 25–27).

CRI retained Rudd because it did not have personnel in Uzbekistan and would not be able to get an

operative there in time to deal with the Kiamilev arrest.  (*Id.*, Ex. A at 30–31).  CRI did "no

independent checks on Rudd," relying "totally on the [United Resources Group] recommendation.

 (Id., Ex. A at 175).  CRI "had no information to indicate" that Rudd had experience in kidnap-and-

ransom cases but did not believe that Kiamilev's arrest was such a case.  (*Id.*, Ex. A at 27).  Hildreth

confirmed in his deposition that he considered Rudd to be part of the "appropriate manpower"  CRI

was required to provide under its Agreement with PIA.  (*Id.*, Ex. A at 93).  Hildreth testified that

throughout CRI's involvement with Interspan, he forwarded reports from Rudd to Johnson and to

PIA without taking any steps to determine the veracity of the information that Rudd conveyed.  (*Id.*,

Ex. A at 200).

On the same day Johnson initially contacted CRI, he emailed Emir Kiamilev about Eskender

Kiamilev's arrest and the Interspan insurance Policy:

> We've been talking here some more and there's a couple things that
> will help our case.  First, we need to get Bakhrom to document the
> entire ordeal on paper for us.  We need to know what time/day
> everything went down.  The order.  Who was in custody and where.
> How long they were there, etc.  if possible, he should e-mail us this
> document . . . .
>
> Next, it would be GREAT if we could get some kind of document in
> the end that says we agree to give them all our inventory/assets if
> they let all our people go free and agree to drop the matter.  It sounds
> difficult, but might be possible . . . maybe through Takhir.  Just tell
> him, look, give us a document that you won't touch our people any
> more in exchange for confiscating our inventory.  You can tell him
> that our shareholders have to have such a document so they don't
> come back on us, etc.

(Docket Entry No. 54, Ex. C-133).  Emir Kiamilev replied: "Okay, I will get to work on this ASAP. In the meantime could you please forward me the policy, I'm very interested in reading it."  (*Id.*). Emir Kiamilev testified that he tried to get the type of letter Johnson requested from Takhir, who worked in the Tashkent prosecutor's office, but was unsuccessful.  (*Id.*, Ex. D at 112–13).

The next day, February 17, 2006, Hildreth faxed Van Wagenen a report with information Fiacco had obtained from Bakhrom.  Hildreth reported that although "Uzbek partners of Interspan have been unable to learn why Eskender was arrested and the warehouses seized," Bakhrom believed the reasons were "a mixture of politics, poor relationship between [the U.S. and Uzbekistan] and the desire of another organization to gain distributorship" of the popular tea brands Interspan distributed in Uzbekistan.  (Docket Entry No. 32, Ex. 2-K).  According to Hildreth, Bakhrom reported that Interspan employees were interrogated in Uzbek security offices and "asked to provide letters denouncing Eskender."  Although "mild torture was applied," no Interspan employee was under arrest.  (*Id.*).  Bakhrom reported that he had spoken with Eskender Kiamilev, who was being treated in a medical clinic.  Hildreth also conveyed information from Johnson that on February 17, 2006, the U.S. Consular official, Ballard, had escorted Eskender Kiamilev from the medical clinic to the airport to try to put him on a flight out of Uzbekistan.  Ballard was met by Uzbekistan authorities, who took Kiamilev back into custody and refused to allow him to return to the hospital.  Johnson reported that Kiamilev had had a "heart episode" while in custody.  (*Id.*).

Hildreth asked Owen Phillips, an analyst with CRI's worldwide advisory information service, for an assessment of the reported situation.  Phillips emailed Hildreth on February 17, 2006:

Regarding the apparent expropriation of a client's business:

Property rights in Uzbekistan are extremely weak.  The judicial system is entirely subservient to the government.  Thus, it would be

> a relatively small matter for anyone within Karimov's regime, especially close friends and family members, to orchestrate the expropriation of a private enterprise's assets.  Karimov's daughter has been implicated in a number of scandals . . . and is widely believed to have built up her business empire, which includes Uzbekistan's largest mobile telephone service operator, by using her family ties to orchestrate false arrests and business takeovers. . . .

> Uzbekistan does have legislation in place to govern official expropriation of assets.  However, the Karimov regime regularly circumvents these laws.  Specifically, the government is supposed to pay compensation, especially to foreign investors.  In many cases, this has been done, though hardly ever at fair value.  The fact that the client has been essentially arrested on the basis of trumped-up charges indicates that the government is trying to avoid paying any monetary compensation whatsoever.  The prospects of outside legal intervention or arbitration are slim-to-none.

> I would say the best case scenario is to see him classified as a persona non grata and deported, with a complete loss of all business holdings in Uzbekistan.

(Docket Entry No. 48, Ex. 1-C).

On February 19, 2006, Bakhrom emailed Johnson and Emir Kiamilev.  Bakhrom reported that the owner of the Samarqand Tea Factory "is the guy who had wrote this scenario," and that Eskender Kiamilev's case was under the control of Uzbekistan's First Vice Minister of National Security.  (Docket Entry No. 54, Ex. C-126).  Bakhrom asked for a letter in support of his application for a U.S. visa.  He stated that although he had presented himself to the Uzbekistan officials as only a ChP that had borrowed money from Eskender, and "right now they are just talking and getting info from everyone," soon the officials would "start to work with the taken documents from office . . . so in this case the things will be bad."  Bakhrom also referred to "some paper works" in Eskender Kiamilev's flat "that must be d[e]stroyed."  Bakhrom suggested that Emir Kiamilev

21

"should ask someone from Diplomats to open the flat and clean all the documents . . . . this is highly urge[nt]."  (*Id.*).

On February 20, 2006, Hildreth emailed Johnson twice.  The first email identified Rudd as "our representative in Tashkent" and asked Johnson for a letter "authorizing [Rudd] to conduct inquiries on [Interspan's] behalf."  (Docket Entry No. 32, Ex. 2-L).  In the second email, Hildreth stated that Eskender Kiamilev was under the care of Dr. Jan Reimer at the Tashkent International Medical Clinic, that he was in stable but serious condition, and that the doctor was recommending transfer to a European medical facility for "stenoses" surgery.  Hildreth stated that Ballard was "negotiating with Uzbek authorities" for Eskender Kiamilev's "release and permission to leave the country for medical treatment."  (*Id.*, Ex. 1-C).  Hildreth reported that Uzbek authorities had sent Ballard a copy of the formal charges against Kiamilev, and that the charges involved "large sums of local and foreign currently found in [his] office and home," and that Kiamilev was represented by attorneys who were "well connected with the government" but probably not "equipped to deal with the 'backroom' negotiations which are the typical way conflicts are resolved here."  (*Id.*).

Later that day, Hildreth emailed Fiacco to report information learned from Johnson.  Hildreth wrote:

> I have spoken with the client who has updated me as follows:
>
> Apparently the authorities in Uzbekistan have indicated that they plan on moving the victim from the International Hospital to a prison where there is an infirmary.  The client says that the facility is described as a torture chamber (their words) and that once there the victim will be forced to turn over the company, admit to the charges and then probably we will be notified that he died while in custody from the heart condition.  Again this is the client's description not mine.

(Docket Entry No. 32, Ex. 2-M).  Hildreth stated that Johnson had asked whether Rudd could

"extract the victim and secretly take him out of the country."  Hildreth responded that CRI "would

not do that" because it could violate Uzbek law.  Hildreth added:

> I have also recommended to the client that they contact their legal rep
> in Tashkent and consider putting up the company/inventory as bond
> for the victim in return for allowing the victim to leave the country
> and get medical care.  They can promise that after that the victim will
> return to face the charges.  Obviously the victim will never return and
> the company will lose its inventory and warehouses/offices, but that
> is going to happen anyway.

(*Id.*).  Hildreth testified in his deposition that he wrote this email "early on" in the investigation and

his comments "reflect[ed] conversation between Eric and myself," but he "d[id]n't have a basis to

say" that Interspan would lose its inventory and offices "anyway."  (Docket Entry No. 54, Ex. B at

116–17).

Hildreth updated Van Wagenen as to Eskender's medical condition and location in a

February 20, 2006 fax.  In that fax, Hildreth added that Johnson had said that a decision would be

made the next day about whether Eskender Kiamilev would be permitted to leave Uzbekistan.

(Docket Entry No. 48, Ex. 1-D).  Interspan did not offer the company or its property as a bond for

Kiamilev's release.

That evening, after conferring with Van Wagenen, Buck Kidder of PIA emailed John L.

Wortham, the broker for Interspan's Special Coverages Policy.  Kidder relayed that in addition to

requesting help in securing Eskender Kiamilev's release, Interspan had asked CRI to "take an

inventory of what's been seized."  Kidder stated that he and Van Wagenen agreed that CRI could

continue working toward Kiamilev's release, but that the additional inventory work "would NOT

be covered by our policy."  Kidder stated that paying for such work would be tantamount to

"pay[ing] the expenses relating to an uncovered theft/expropriation situation."  (*Id.*, Ex. 48, Ex. 1-UU).

On February 21, 2006, Hildreth forwarded Johnson an email from Rudd.  In the email, Rudd stated that he had spoken to a local Uzbek legal specialist, Vissaryon, and had "more optimism that we will succeed to get [Eskender Kiamilev] free if we can keep him out of the hands of those who arrested him."  Rudd stressed that "Eskender must continue to take the position that his role was limited to only supervising the distribution chain to make sure that the money spent for purchase of the tea was returned to the supplier and that all the importers were acting properly."  Rudd added that "[t]he only questionable element in this process is the amount of USD or other foreign currency found during the arrest process."  (Docket Entry No. 32, Ex. 1-B).  Rudd opined that the "whole process was primarily designed to frighten [Eskender Kiamilev] and take him out of the tea market."  Rudd explained:

> Tea is currently considered to be a monopoly of the state.  The Samarqand Tea Factory is the primary raw tea processor and monopoly supported by the state and has drawn the interest of the first family.  I am sure Eskender has been under observation for some time and only now was a decision taken to neutralize him and remove his network from the market.  If the state or Samarqand Tea can dismantle the Interspan network then I think any personal interest in holding Eskender will disappear.

(*Id.*).  In the same email, Hildreth forwarded a message from Ballard stating that he had been in touch with the prosecutor's office and that Eskender Kiamilev "w[ould] most likely be released today."  (*Id.*).  Hildreth relayed Rudd's theory as to the motive behind Eskender Kiamilev's arrest, and the news of his release, to Van Wagenen in a fax that same day.  (Docket Entry No. 54, Ex. A-23).

24

Later that afternoon, Hildreth emailed Rudd and Fiacco with news that Eskender Kiamilev had been released and was on a flight to Los Angeles.  (Docket Entry No. 32, Ex. 2-O).  Hildreth faxed Van Wagenen two days later to report that Eskender Kiamilev had arrived safely and that CRI was trying to arrange an interview with him in California.  (*Id.*, Ex. A-4).  The record does not show whether the interview occurred.

### G.      Interspan's Independent Retention of Rudd

On February 22, 2006, the day after Eskender Kiamilev's release, Johnson emailed Rudd to ask whether Rudd would be willing to work directly for Interspan to broker a deal to recover the company's Uzbekistan assets.  Johnson had tried to retain Rudd's services through CRI, but that would require a "high per diem rate."  Johnson testified in his deposition that the per diem rate quoted was between $1,700 and $2,000.  (Docket Entry No. 54, Ex. C at 170–71).  Johnson told Rudd that "ALL of [Interspan's] assets [we]re in government hands—including all . . . inventory, cash, equipment, etc."  Johnson indicated that the value of the seized assets was over $2 million, mostly tied to inventory.  Customers also owed Interspan a "fairly large amount of money" that Johnson feared would "disappear if they believe we do not have a man on the ground."  If Rudd could broker a deal, Interspan would pay him 5% of whatever was recovered from the Uzbekistan government.  Johnson added:

> If you are agreeable to such a relationship, then we would need to determine . . . the best way to deal with CRI.  I'm not sure of your relationship with them.  As I said, I respect them greatly.  They introduced us to you and I do not want to do an end-around and cut them out of the loop just to save some money.  But, we simply cannot pay their per diem fee.

25

(Docket Entry No. 54, Ex. C-64).  Rudd responded by email the same day.  He accepted the offer on the conditions that Interspan pay up-front for out-of-pocket expenses and for a driver and that Interspan retain the services of Vissaryon, Rudd's legal contact in Uzbekistan.  Rudd explained that he had no contractual relationship with CRI and that his engagement had been "ad hoc" and had ended with Kiamilev's release.  (*Id.*, Ex. C-65).  Johnson replied, agreeing to all Rudd's conditions.  (*Id.*, Ex. C-66).  Johnson later testified that he and Rudd had reached an agreement in principle, but the agreement was never memorialized because Mikhail Matkarimov was arrested several days later and CRI "was back on the case."  (*Id.*, Ex. C at 90–92).

On February 24, 2006, Rudd emailed Johnson after meeting with Vissaryon, his Uzbek legal contact.  Vissaryon reported that when arrested, Eskender Kiamilev had been carrying $4,000 USD in cash as well as an undetermined amount of Uzbek soums, and the driver had been carrying $8,000 USD in cash.  Additional amounts of American dollars and Uzbek soums were seized from Eskender Kiamilev's office.  The total amount seized was estimated to be the equivalent of between $35,000 and $40,000 USD.  Rudd characterized the large amounts of undeclared dollars as a "major problem."  According to Rudd, "Eskender must continue to assert that funds were left behind by his son or he received them from other legal sources such as cash transfers into [Uzbekistan] via local bank."  Rudd also described as a "problem" the fact that to escape legal trouble, "Bakhrom must show he deposited receipts of funds from sales into a bank account used to facilitate payments to supplier."  Rudd stated that the Deputy City Prosecutor was "building a case" against the Interspan network but that no charges had issued yet.  Rudd also indicated that local authorities were "hinting"

26

that they wanted to connect Eskender to funding of the Andijan uprising.[14]  (Docket Entry No. 32, Ex. 1-E).  According to Rudd, Interspan had $1,200,000 worth of tea in two warehouses, some in bulk and some packaged, registered in Bakhrom's name.  Rudd stated that the tea in the warehouses "should be immediately transferred out to another location" and that Bakhrom's assistance would be "key" to "getting control of goods currently in warehouses and customs bonded areas."  Rudd indicated that Interspan had $800,000[15] of tea in a customs-bonded warehouse that would be confiscated in two months if it were not sold to distributors or shipped back to Dubai.  Rudd stated that he had not been able to contact other members of Interspan's network, possibly because they were "spooked and in hiding."  (Docket Entry No. 32, Ex. 1-E).

Rudd asked for "a complete specification of what was shipped and details of what is currently in customs bond."  Rudd stated that he knew "a Kazakh tea importer/wholesaler who may be a possible buyer," and that an "[a]lternative strategy" would be "to move to Customs bond in Southern Kazakhstan."  Rudd also requested "more details about form of tea sales in Uzbekistan," including whether "the tea [wa]s cleared via Customs using undervalue invoices."  Rudd commented that if so, "this w[ould] make sales to other distribution chains more difficult."  (*Id.*).  Rudd emailed again on February 27, 2006 to advise that Interspan "need[ed] to begin to collect Dubai export documents showing value of tea exported to Uzbekistan to prove you did not clear customs here with undervalued invoices."  (Docket Entry No. 54, Ex. C at 159–160).

---

[14]  The Andijan uprising, sometimes spelled Andijon, is a May 2005 event in which Uzbekistan officials fired into a crowd of peaceful protesters, killing hundreds and later arresting hundreds more.  The protesters were protesting the trial of dozens of Uzbek businessmen on charges of Islamic extremism.  (Docket Entry No. 32, Ex. 2-A).

[15]  It is not clear whether the $800,000 was part of, or in addition to, the $1.2 million in tea identified as being in the two warehouses.

Johnson forwarded the email to Emir Kiamilev.  Responding to Rudd's question about the goods in customs bond, Kiamilev wrote: "To my knowledge in the bonded warehouse are two Chinese wagons, one Impra container, one Akbar container.  The total value (real cost) equals $150,000."  Responding to Rudd's question as to whether the tea was underinvoiced, Kiamilev wrote: "Yes, we did underinvoice, so the difference between imported cost and selling price is huge."  (Docket Entry No. 54, Ex. D at 128–29).

### H.    Mikhail Matkarimov's Arrest and Detention

On February 27, 2006, Johnson contacted Hildreth at CRI to report that he had just learned that his brother-in-law, Mikhail Matkarimov, had been "formally detained" after reporting to the Tashkent Prosecutor's office on February 24, 2006 for "routine questioning."[16]  Hildreth sent a fax to Van Wagenen that same day, stating that Johnson believed that the arrest was "connected with the Uzbekistan government's efforts to seize Interspan's tea business and the illegal detention on February 13, 2006 of Eskender Kiamilev."  Hildreth's fax stated that according to Johnson, Matkarimov had not broken any laws, and because he was a local, "someone [would] accept money, or a 'bond' of some sort in exchange for his release." (Docket Entry No. 32, Ex. 2-P).

Hildreth had reinitiated contact with Rudd and had asked him to gather additional details. Rudd emailed Johnson to ask how to respond to the CRI request that Rudd work for them on the Matkarimov arrest.  (Docket Entry No. 54, Ex. C-74).  Johnson responded:

---

[16]  Interspan's complaint alleged that because Mikhail Matkarimov could not immediately be located, his wife, Natasha Matkarimova, was abducted in his place on February 24, 2006, and that government agents demanded that Mikhail surrender himself in exchange for her release.  Interspan alleged that Mikhail Matkarimov did so on February 25, 2006.  (Docket Entry No. 1 ¶ 82–84). The summary judgment record does not contain evidence as to Natasha Matkarimova's detention.

> You can handle CRI as best you see fit.  We need them involved in the case because they are the agent of our insurance company.  So, regardless of whether you take their case or not, they will hire someone in Uzbekistan.  I would rather see you make the money from them.  And, as far as I'm concerned, they would be hiring you to work on Misha's case; you are working with us regarding the assets.  I would rather that it not be mentioned that we have an arrangement with you since CRI was trying to convince us to use your services at a daily rate which we could not afford through them.  But, if you think it's necessary, I'm sure I could explain our situation to them.

(Docket Entry No. 54, Ex. C-75).  Rudd responded:

> Thanks for support and clarification.  I am waiting for a report on Misha's situation and then will reply to CRI.  Yes, I agree we don't want anyone else getting involved in this case who could confuse the issue or mess it up completely.

(Docket Entry No. 54, Ex. C-76).

Also on February 27, 2006, Johnson sent a memorandum to the principals of Centrax International about the Interspan situation in Uzbekistan.  Johnson reported that the Tashkent prosecutor had not yet dropped the case against Eskender Kiamilev and would probably try him in absentia.  Johnson also reported that the Tashkent prosecutor was building a case against himself and Emir Kiamilev.  Johnson described the Interspan assets remaining in Uzbekistan as "cash, inventory, debts from consignments to dealers, and equipment."  Johnson opined that it would "difficult to collect the cash and debts.  Because everyone knows that our business is no longer operating, they have little incentive to repay their debts."  Johnson did not believe that Interspan could find a buyer for its equipment "since no one now will want to compete against the [Samarqand] Tea Factory."  Johnson stated that selling the inventory would initially be difficult because "Army personnel are guarding Eskender's residence, our office, and our warehouses."  He speculated that "once things calm down, someone will be looking to make a deal in order to release

our goods."  Johnson also stated that if the kidnapping or extortion provisions Special Coverages Policy applied to the lost inventory, "we might be able to collect up to the $2,300,000 in assets that were lost."  (Docket Entry No. 54, Ex. C-60).

On February 28, 2006, Johnson wrote to Rudd asking whether he had "any connections that would make a 'deal' to let [Mikhail Matkarimov] out."  Johnson stated that "[o]f all the people in the company, Misha is the cleanest.  He's never touched cash money, and has always kept very clean books. . . . [W]e think that the reason they are holding him is because no one has made any money off the deal so far, and they are looking to make something from this mess."  Johnson also asked whether Rudd had been able to contact Khorshid, an Uzbegim manager.  Johnson explained that "[a] pretty large chunk of the inventory is on Uzbegim's name, and my understanding is that they are still able to conduct business.  We don't see why that inventory could not be sold right now."  Johnson also asked Rudd to arrange for photographs to be taken of Interspan's warehouse and office and Emir Kiamilev's house, because "[w]e have an insurance policy that MIGHT cover our losses, and we'd need the documentation."  Johnson added that the photographs would be "good evidence" and that if Interspan received insurance funds, "we'd pay our agreed fee with you."  (Docket Entry No. 54, Ex. C-138).

On March 1, 2006, Hildreth faxed Van Wagenen an update from Rudd.  Hildreth reported that Rudd had learned "from his sources" that Matkarimov's arrest was "mainly to attract an offer from the victim company/relatives to settle this problem in the typical Uzbek way with a payment."  Rudd reported that no formal charges had yet been filed and that Matkarimov was merely a "hostage" for the company.  (Docket Entry No. 48, Ex. 1-F).

30

On the morning of March 2, 2006, Rudd emailed Johnson details of a meeting that he and Vissaryon had with Mikhail Matkarimov's brother, Sergey.  Sergey Matkarimov reported that "SNB had been monitoring [Interspan's] operations for more than 2 weeks before the seizure of Eskender and the cash he was carrying," and that the investigation "included taking of 30 or more photographs of money exchanging hands, movement of goods and transport of funds."[17]  According to Sergey Matkarimov, "[m]ost of the active employees spend most of the day in the corridor of the Prosecutor waiting to be invited for questioning."  Mikhail Matkarimov had been transferred to the "Sezo Investigatory Isolation Ward" and was being denied access to his attorney and medical treatment for his bleeding ulcer, in violation of Uzbek law.  Sergey Matkarimov also relayed rumors that Uzbekistan authorities were trying to connect Interspan to narcotics dealing or to the "Andijan incident."[18]  Rudd also reported that "Uzbegim and its role in the arrest, its past and current connection to Interspan and related companies has surfaced again," and asked Johnson to "[p]lease dig deeper to see if there may have been some internal conflict between Eskender and Uzbegim principals."  (Docket Entry No. 32, Ex. 1-G).

Hildreth also received a report from Rudd that Mikhail Matkarimov was in an "investigation prison" called "Sezo," without access to his attorney or to medical treatment, and that the authorities were trying to link Interspan to narcotics dealing and the Andijan uprising.  Hildreth relayed this information in a fax to Van Wagenen,  (Docket Entry No. 48, Ex. 1-G), and in an email to Johnson, (Docket Entry No. 32, Ex. 1-F).

---

[17]  "SNB" referred to the Uzbekistan Committee for National Security.

[18]  The "Andijan Incident" referred to the Andijan Uprising described, *supra*, in footnote 14.

Later on March 2, 2006, Hildreth emailed Rudd stating that he had spoken with Johnson and had "mention[ed]" that "with the detention of Eskender and then Misha, they can expect other family members or Interspan associates to suffer the same ordeal, until the company resolves their status with the government."  (Docket Entry No. 32, Ex. 2-Q).  Hildreth later testified that he had meant only that he wanted to "put[ ] Eric on alert that if he was concerned about—you know, based on his feeling that this was all illegal and the government was doing this illegally, he might want to take some steps to advise these people that they could . . . also be detained.  And if they were able to get out of the country, they might want to get out of the country."  (Docket Entry No. 54, Ex. A at 47–48).

In a March 3, 2006 email to Johnson, Rudd stated that he had a source that could secure Matkarimov's release for $10,000.  Rudd stated that he "c[ould] not report this option to CRI" and asked Johnson's permission to "go forward and make our offer."  (Docket Entry No. 54, Ex. C-79).  Johnson responded that he did not want to pay the $10,000 without better assurances:

> Please don't take this the wrong way . . . [b]ut regarding the payment, I don't understand why such a large payment would not ensure that the charges are dropped completely. . . .
>
> My main concern is that we are going to end up paying 10K, then in a week, or month, Misha's going to be sitting in the same cell.  And, since the authorities have all of our assets, the 10K is going to be coming out of my personal pocket . . . .

(*Id.*, Ex. C-80).

On March 7, 2006, Rudd emailed Hildreth after meeting with an individual named Arustamov, a former prosecutor in Tashkent.  According to Rudd:

> 1.    Action against [Interspan] operations was initiated by the Committee for National Security (SNB) after a long investigation which included photos taken during exchange of goods and money.  The contact of Arustamov believes that the action was requested by

32

> Mirabror Usmanov, the former Minister of Trade and former Deputy
> Prime Minister who is the current beneficial owner of Samarqand
> Tea.  It is alleged he wanted to break the Interspan network and put
> them out of business.
>
> 2.  This case is being monitored by the General Prosecutor of
> Uzbekistan, Presidential Advisor Office and SNB.  Arustamov
> believes at this very moment it would be very difficult to find a
> simple solution to suspend legal action against all involved in the
> company network.  The current investigative priority is to build a
> case against all USA citizens involved in the business which could be
> the basis of an extradition request. . . . I think the strategy is to block
> the return of any of the principals of the company.

(*Id.*, Ex. C-81).  Rudd added that "[t]wo different special departments are investigating this case,"

one dealing with large-scale corruption and the other with "tax and currency related crimes."  Rudd

stated that "[t]he Prosecutor is alleging that the Interspan network imported low-quality tea, under-

declared value during Customs clearance and sold at five times actual cost."  (*Id.*).  Rudd added that

"Arustamov believes it will be almost impossible to stop this action.  He recommends, and I concur

with this, that Interspan should attempt to approach Usmanov and try to negotiate some final

solution."  (*Id.*).  Hildreth forwarded the contents of this email to Johnson.  (Docket Entry No. 32,

Ex. 2-R).

On March 7, Bakhrom sent Johnson and Emir Kiamilev an email confirming that authorities

were trying to build a case against the ChPs associated with Eskender Kiamilev and against

Uzbegim for understating their margins on tea sales.  Bakhrom explained that the authorities were

trying to determine what the ChPs associated with Eskender Kiamilev were doing with the

difference between the sales price for the tea (Bakhrom reported that one pack of Tashkent tea sold

for an average price of 480 soum) and the money from each sale deposited in the bank (Bakhrom

reported a typical deposit of 70 soum per pack).  Bakhrom wrote: "For UZBGM to explain this

difference will be difficult, because that means that they were hiding the compan[y's] margin and

trying not to pay taxes from profit. . . . You know this scheme. . . ."  Bakhrom reported that one ChP had told the authorities that he gave the cash difference to Eskender Kiamilev.  Another man reportedly stated that "if the UZBGM will give him up . . . he is going to tell every true about our and they business."  Bakhrom wrote that the investigation had "calmed down" as to the ChPs but had begun to focus on Uzbegim and "Trade," a company associated with Uzbegim.  Bakhrom added: "[R]egarding inventory Dear Emir . . . I want you to understand that none of your inventory had been confiscated but were taken for temporary."  (Docket Entry No. 54, Ex. C-127).

Hildreth testified in his deposition that Johnson telephoned on March 8, 2006 to report that Interspan "had been approached by someone who said, 'for $500,000, I can get the government to drop the charges and [Interspan] can probably also continue to operate in Uzbekistan.'"  Hildreth testified that Johnson "knew from prior conversations that [CRI] would not be involved in anything like this."  Johnson had therefore asked CRI to "stand down . . . so as not to do anything that might interfere with that."  (Docket Entry No. 54, Ex. A at 53–55).  Hildreth emailed Fiacco on March 8, 2006, stating that he had just instructed Rudd to "stand down on this case."  Hildreth explained:

> After [Rudd's] report yesterday, [Johnson] contacted me this morning to say that the family had been contacted by the company Uzbegim. . . . They advised that an unknown person had approached the company, Uzbegim, to report that they could negotiate the release of the victim and return of much of the inventory and that all charges would be dropped.  There was a significant payment that would be required.  This payment is not considered a ransom and I have instructed [Johnson] that we could not be a party to making a bribe to a prosecutor or government nor is such a payment covered by their insurance policy.  [Rudd] and I had already reached agreement on this.  Negotiating a ransom payment with insurgents, terrorists or criminals is totally different from making a payment where the government or official of a country is involved.  [Johnson] advised that he would get back to me tomorrow or Friday with results of their negotiations.

34

(Docket Entry No. 54, Ex. A-12).  Rudd responded to Hildreth later that day, stating, "I got similar feedback from my sources yesterday as well.  Let's hope that all will be as promised and they can start again with a clean slate.  I will instruct all involved to stand down."  (*Id.*, Ex. A-13).  Johnson testified that he had understood "stand down" to mean only that CRI would not interfere with the deal, not that CRI would leave the case entirely.  Johnson testified that he expected CRI to "hold tight and . . . continue monitoring the case but not . . . go up and try to make a deal with anybody." (*Id.*, Ex. C at 164–65).

Emir Kiamilev testified that Khurshid, who worked for Uzbegim, relayed an offer for Interspan to pay $500,000.  Khurshid was going to negotiate with a man identified only as "Top." Kiamilev did not know who "Top" referred to.  (*Id.* Ex. D at 148).  Rudd wrote to Johnson about Khurshid's proposal. "This recent action does not surprise me.  Arustamov reported that he heard from his sources that a proposal was being formulated but had no idea who was behind this." (Docket Entry No. 54, Ex. C-83).

On March 13, 2006, Hildreth emailed Johnson requesting "an update so I can continue to advise [Rudd] as to the status even though we are standing down at this time per your instructions." Hildreth testified that he sent the email "to satisfy [his] curiosity about . . . whether anything had developed" and to "confirm 5 days after we had been shut down that in fact it was understood we were not responding to this case and [Rudd] wasn't responding to this case."  (*Id.*, Ex. B at 52–54).

Khurshid's negotiations were unsuccessful.  On March 15, 2009, Rudd emailed Johnson that the process was at a "dead end," explaining that:

> I was told that Interspan was not the target and Eskender was just a
> channel to get at someone else. . . .

35

> Sorry to hear you got the daughter involved.[19]  You are getting bad advice.  Let's hope the damage is reversible.  If the President hears she stuck her nose into this mess he will be really pissed if indeed he was involved.  Let's for argument sake say he is involved.  Let him take out his enemy.  We can get info to the right people that Interspan has no involvement with his target at the present time.  You will have to paint a good picture and story line that is believable.  I can see why someone would think Uzbegim is the owner of the tea business.  Interspan is a shadow company with absolutely no tangible, visible presence in Uzbekistan.  All is based on verbal agreements.  No contracts.  No office presence.  No representation.  Etc!!!!  I have a hard time explaining to someone like Arustamov and others like him that the business is controlled by foreigners.  Uzbegim is a visible, tangible, reachable target.

(Docket Entry No. 54, Ex. C-87).

Four days later, on March 19, 2006, Rudd emailed Johnson with additional updates:

> Just finished meeting with Arustamov.  He met yesterday again his contact in City Prosecutor.  From the details (or lack of details to be more precise) it seems that this whole process is being directed from above. . . . Arustamov reports that his contacts still take the position that this action was ordered by or initiated by Usmanov. . . . So we now have two street versions of this skaska.  One is that President had a feud with Khadyatullo son of Ibragimov and set out to destroy Uzbegim.  The other version is Usmanov wanted Interspan tea business and he got cooperation of Qadirov, Republican General Prosecutor and SNB to shut down the network.  In either case I can not see the current logic or strategic goal of either possibility.  It has been over a week since your last attempt via Uzbegim and daughter was shut down.  Who is waiting for whom? . . . . Going to court solves nothing and there will be no payoff or control over the tea brands.

(Docket Entry No. 54, Ex. C-89).

On March 24, 2006, Johnson informed Hildreth that no agreement had been reached with the prosecutor, but Interspan was continuing to work through lawyers in Uzbekistan and would notify CRI if any additional response was required.  (Docket Entry No. 48, Ex. 1-J).

---

[19]  The record does not show, and the parties have not explained, which "daughter" this email refers to.

Rudd met with Matkarimov's lawyer, Venir, and Matkarimov's brother, Sergey, on March 30, 2006. The following day, Rudd emailed Johnson about the meeting:

> Sergey's single focus is to separate Misha from any legal association with the goods in storage and keep him completely away from any association with Uzbegim. I totally agree with that tactic. It seems that the current legal tactic is to put the onus only on Uzbegim. Sergey gave me background on the parent company of Uzbegim and its connection via one leg to the "family." At the same time he confirmed my suspicion that Beta is the primary beneficiary of your close down. Also with the family benefitting from both Uzbegim and Beta it makes no difference to them who gets the market. They win both ways.

(Docket Entry No. 32, Ex. 2-T). Johnson responded on April 1, 2006, asking if Venir had seen written charges against Matkarimov. Rudd replied:

> I asked Venir if he had seen the charges and he said no. He finally was granted access to Misha for a short time and plans to meet him again next week. Sergey claims to have gotten confirmation that Misha is charged with a minor economic crime but this charge does not permit detention. The prosecutor is using a loop hole in the law which permits detention of a suspect to up to 3 months with an option to extend this detention month by month after this. The whole process surrounding Misha's arrest is illegal but we must understand we are in a country were there [is] only one law—"The law of the lord of the manor." The prosecutor is working only on the basis of instructions from someone who is in power and they could care less about the consequence of not following legal procedures. Who is going to punish them? No one!!!! Misha is just a hostage to be used to extract the maximum from you and the rest of the family.[20]

(*Id.*). Johnson also expressed concern to Rudd about Sergey's plan to separate Matkarimov from the tea inventory:

> Regarding Sergey's strategy, you are in a better position than me to know what is happening. But, the one thing that I am concerned

---

[20] Johnson's questions and Rudd's responses appear in the body of a single email. It appears that Rudd, responding to an email from Johnson, typed responses paragraph by paragraph in response to text quoted from Johnson's email.

about—mostly because of Bakhrom's concerns—is that Misha's lawyer is making a big mistake by separating Misha from the inventory.  All of our patents rented space on Mishas warehouses.  Because of this, Misha was responsible for each patent's inventory on his warehouse.   There is documentation that I'm sure the Prosecutor has which states how much inventory was in Misha's control.  What Bakhrom is very afraid of happening is that if no one claims the tea, then there will be a large shortage between the amount of tea that should be on the warehouse and the amount of tea that is claimed.  And, logically, they will charge Misha with stealing that tea—which I'm sure is a lengthy prison term.

(*Id.*).  Rudd replied:

> I asked Venir about this question and he went into an elaborate explanation which I must say I agree with.  There is just a basic conflict of interest between you saving your capital (tea) and keeping Misha out of jail.  It will be difficult without some divine intervention to accomplish both goals.  Misha can not be charged with any more serious crime if he sticks to his current story.  If he accepts responsibility for the tea it means someone else is off the hook and Misha firmly connected to the Uzbegim problem and will face more serious charges.  Yes, the ChPs are all pushing the responsibility off to Misha.  Undocumented tea i.e. means it was already sold according to the books, sits in the inventory.  If Misha accepts it as his then he is holding the bag when they ask why it is there if the books show it has been sold.  Questions like where is the money from the recorded sales, etc. will be posed to Misha.

(*Id.*).

Johnson also told Rudd that he had heard Uzbegim had already cut a deal.  Rudd responded: "Where is this information coming from?  Bakhrom?  Uzbegim made what kind of deal with whom?  If Uzbegim makes a deal I hope it is not at your expense since they are currently the main target of the prosecutor.  I hope for your sake this 'deal' is real and won't be aborted like the last one."  (*Id.*).

Johnson sent the following email to Rudd the next day:

> I think that Sergey and/or Misha's attorney are misunderstanding the situation with the tea.  Bakhrom has tried to explain it to Venir, but he seems not to be understanding. . . .  There is LESS tea on the official warehouses than on official documents.  That is why

38

everyone is jockeying to claim the tea.  For example, according to official documents, Yorkin should have 50 Mill soms of tea, but there is only 17 Mill on the warehouse.  Akhat should have 52 Mill, but there is only 38 Mill on the warehouse.  Yorkin and Akhat have both told the prosecutor that Misha was responsible for their tea on the warehouses.  Since Misha was responsible, the prosecutor is going to say that Misha stole the tea that is missing.  According to Bakhrom, stealing of tea is a large criminal act that is punishable for several years in Prison.  So, if he doesn't claim the tea, Misha will have a shortage, and more serious charges will likely be filed.

We have several warehouses in Keles.  There are two warehouses full of tea that are undocumented.  The tea in these two warehouses is the tea that Misha should claim.  It would cover the shortages on Misha's documents, so he would not face a problem of "stealing" the patents' tea.

Bakhrom doesn't understand Venir's position at all.  He believes that having more actual tea than official documents is only a minor fineable offense.  But, having a shortage is a big problem.  And, he doesn't understand why claiming of that tea will connect Misha to Uzbegim since that tea is not in Uzbegim's name.  If no one claims the tea, it will just be confiscated by the prosecutor without an owner.  . . . .

If what Bakhrom is saying is true, which I believe it is, then Misha is putting himself in bigger peril.  And, Bakhrom and Bakhtior[21] are the only two people in the whole company that know the inventory numbers in Keles.  Not even Misha had the numbers.  So, I don't think it is possible for Venir to know what tea is on what warehouse, and even whether there are shortages or overages.  . . . .

Regarding the closing of Uzbegim's case, I personally heard it from Mirrahim (from Ber-ad).  Emir also heard the same thing from his channels.  Uzbegim has been trying desperately to claim the tea in the unofficial warehouses as theirs to cover their official shortages.  But, mid-week, they told Bakhrom they no longer needed that tea.  So, I think that it is probable that they did close their case.

If Uzbegim closed their case, it would explain why the SNB friend now things it is safe to close our deal.

---

[21]  The record does not otherwise identify Bakhtior and the parties have not explained his role.

(Docket Entry No. 54, Ex. C-95).  Johnson testified in his deposition that "undocumented" meant

that title to the tea had already been transferred to the ChPs.  Johnson testified that Interspan

provided warehousing for the tea but was not "responsible for keeping the documentation."  (*Id*, Ex.

C at 175–76).

On April 12, 2006, Rudd wrote to Johnson:

> I had a long conversation with Bakhrom and was able to confirm
> some [of] my data sources about your operations via a tax free
> "fund."  In November 2005 my group was asked to investigate an
> operation which had business connections with Kazakh exporters
> who had taken out insurance with Kazakh State Insurance Company.
> My sources of info near Qodirov said this tea problem had roots in
> this "fund" and a first family member. . . .  I suggest you review all
> tea operations that might have gone via that channel to make sure all
> are closed and you can cover your "ass."  Attached is our report on
> this Farmers Connection which Bakhrom said many of the Uzbegim
> related transactions went through.  Try to recall and give me a
> briefing on your past transactions through this tax free channel.
>
> Emir, I think you misunderstood Bakhrom.  I don't get the same
> feeling that your property i.e. houses and apartments are at risk of
> confiscation.  This legal process will take some time in any case and
> it makes no logical sense to dump your assets into the State budget.
> Someone will step up and offer to "fix" the deal for real, spendable
> pocket money.
> . . . .
> New lawyer Farhadaka has spoken with Natasha and will meet
> Misha.  He wants Natasha to put on hold for a while the attempt (at
> my recommendation) to meet with Presidential Advisor so he can
> propose an alternative solution.  I am hoping the news leaks out about
> our preparedness to take the issue upstairs and it will stimulate
> whomever is behind this action to come forward and begin to
> negotiate before it gets into the open and out of his control.

(Docket Entry No. 54, Ex. D-184).  Johnson replied that Farmers had been a "customer" but not an importer for Interspan, and that he and Emir Kiamilev had no "information regarding what types of activities [Farmers was] involved in that would get them into any trouble."  (*Id.*).[22]

On April 15, 2006, Matkarimov's wife, Natasha, received a letter from the First Deputy of the Prosecutor of the City of Tashkent.  The letter responded to one she had sent complaining that her husband's arrest was illegal.  The deputy prosecutor stated that charges had been filed against Eskender Kiamilev, Matkarimov, and other private entrepreneurs.  The charges alleged that these individuals had made illegal sales of tea products in Tashkent and had not deposited the proceeds in the banks, as required.  (Docket Entry No. 48, Ex. 1-N).

On April 19, 2006, Rudd emailed Johnson to tell him about a judgment and fine levied against Bakhrom for dealing in "contraband" tea:

> The judgment against Bakhrom was only dealing with question of tea and determination that it was without documents therefore contraband.  City Prosecutors now drawing up charges against Bakhrom for court action to determine penalties, fines etc.
>
> Not much you can do from your end.  It is obvious that the Prosecutor, Court etc. does not care about legal niceties and they are just focusing on one goal of shutting down the network and grabbing the inventory.  I have Bakhrom scheduled to make his next presentation to the Ombudsman.  All this is necessary so in the future you can bring suit against the government when there is a change in regime.  We still to this day do not know for sure who ordered this action and we don't know why they did it and we don't know what they want from you.

---

[22]  In Emir Kiamilev's deposition, defense counsel asked him about a follow-up email sent to Johnson the same day, April 12, 2006.  In this follow-up email, Kiamilev wrote: "Eric, he's full of shit.  Why would I talk to Charles about Farmers?  This is a conspiracy.  Charles is onto us about insurance."  Emir Kiamilev testified that he had misunderstood Rudd's email.  Emir Kiamilev thought Rudd was describing a conversation with Emir, rather than with Bakhrom, about Farmers.  Emir Kiamilev had never had such a conversation with Rudd.  Because of the misunderstanding, Emir Kiamilev believed that Rudd was attempting "to provide false information that would disclaim our case."  (Docket Entry No. 54, Ex. D at 184–86).  The defendants did not include this follow-up email in the summary judgment record.

(Docket Entry No. 32, Ex. 2-U).

      Rudd expressed similar sentiments in an April 26, 2006 email to Johnson:

> Our main problem with this case is we have only rumors and no facts about who initiated this action against your group.  Beta [teas] seems to be the primary beneficiary.  I noted that the remaining stocks of Akhmad tea in our local supermarkets have been removed to a new location and only Beta is displayed in the traditional place where tea is found.  If I know who was the enemy I could then recommend some kind of strategy.  I get a bad feeling that part of the problem is some kind of internal battle that Eskender was a party to and he should have a better idea of what triggered the action against your network.  Each time I dig a little deeper I am finding out about relationships that were not disclosed in the past to me.  I think this action is the result of a long history of problems that were not resolved at the time they surfaced and the enemy camp just picked the right moment to strike.

(Docket Entry No. 54, Ex. C-103).

      On May 9, 2006, Rudd wrote to Johnson:

> You are in absolutely no position to prove that the goods belong to Interspan.  SNB wanted Eskender to admit ownership in order to make a strong case of contraband, false marketing etc which is not on the list of things they want to charge Misha with.  I would strongly be opposed to any action which you could not prove with export documents, import documents, customs declarations or signed contracts.  Yes, the goods may be morally yours but the document trail I have seen clearly show[s] the ChPs are the owners.  They may have some credit obligations but this is not supported by documentation or contracts.  I think you would seriously complicate the situation if you made any claims that the goods were in fact belonging to Interspan and not ChPs and would confirm that you had set up a false business structure designed to defraud the government out of tax revenue etc.  This action would put the ChPs in jeopardy by undermining their claims that the goods were theirs and imported legally.
> . . . .
>
> I disagree with the notion that Interspan was the main target.  All info that I have gotten even from the beginning when Eskender was detained pointed to Uzbegim and the controlling network of Uzbegim.  Even John Ballard got that same impression from info he

> received.  Eskender just was unfortunate enough to be caught
> carrying large sums of money or he could have been let go without
> the detention. Only Misha who was the gateway ChP for Interspan
> seems to be in any danger of spending time in prison.  He appears to
> be targeted as the sacrificial lamb for the Uzbegim guys after they
> pay off.  All others charged are connected to the Uzbegim structure.
> Eskender is named and likely to be charged mainly due to his
> connection to the Uzbegim holding companies and the possibly
> forged signature on documents they are presenting as evidence.

(Docket Entry No. 54, Ex. C-104).

On May 13, 2006, the Chief of the Administration for the Prevention of Economic Crimes and Corruption, part of the General Prosecutor's Office of the Republic of Uzbekistan, wrote a letter to Matkarimov's wife.  The letter stated that Matkarimov had been part of a conspiracy that included Eskender Kiamilev, the deputy-director of Uzbegim, and JV Trade & Production.  The alleged conspiracy was to use fraudulent business practices to violate Uzbek customs regulations and embezzle property.  The letter stated that investigation on the merits was complete and the case would proceed to trial.  (Docket Entry No. 48, Ex. 1-N).

The indictment against Matkarimov, which issued shortly after this letter, charged him, Eskender Kiamilev, and fifteen other businessmen, with the following conduct:

> prior conspiracy, organized group to commit criminal acts,
> committed such criminal acts as fraudulent businesses, i.e. organizing
> activities of pseudo-private businessmen in order to gain property
> advantages, violation of customs regulations, the transfer of material
> valuables on a particularly large scale, conducting activities subject
> to licensing without obtaining special permission, and the abuse of
> official authority.

(*Id.*).  No Interspan employees besides Eskender Kiamilev were named.  (Docket Entry No. 54, Ex. C at 190–91).  The indictment specifically alleged that Eskender Kiamilev had entered into a criminal conspiracy with the deputy director and other "official persons" of Uzbegim, which itself was a subsidiary of JV Trade & Production International.  The group was accused of creating

43

fraudulent business structures; importing tea and other products through those structures, making

sales on a cash basis but not depositing the cash in banks as required by law; renting warehouses for

temporary use "without agreements"; fraudulently labeling tea; falsifying accounting; and avoiding

taxes and customs fees.  Matkarimov was alleged to have provided storage for the tea pending the

cash sales.  The indictment  also alleged a "deficit on inventory holdings" in two of Matkarimov's

warehouses, in the amount of 240,148,700 soums, and a "surplus of tea products," in the amount of

112,221,100 soums.  Matkarimov denied all the charges.  (Docket Entry No. 48, Ex. 1-N).

I.      **Interspan's Claim Under the Special Coverages Policy**

On June 9, 2006, while Matkarimov was still being tried in Uzbekistan, counsel for Interspan

sent a "Liability Discussion, Settlement Package and Demand" letter to Liberty, PIA, and CRI

seeking recovery under the Special Coverages policy.[23]  Interspan's counsel described the February

13, 2006 arrest of Eskender Kiamilev and the February 24, 2006 arrest of Mikhail Matkarimov,

adding that Matkarimov "remain[ed] in custody as of this writing" and was being tried on "trumped

and ludicrous charges."   The letter described the scene at the trial, in which Matkarimov "was

brought into Court for the trial in shackles, under heavy armed guard, and then caged in front of the

other 'charged' Interspan employees and distributors."  (Docket Entry No. 32, Ex. 2-W).  The letter

stated that when Eskender Kiamilev had been released from custody, Interspan had lost its "physical

assets," which included tea warehoused in Tashkent and Eskender Kiamilev's personal residence.

The demand letter asserted that the seized tea had been "put back into the stream of commerce" and

was being "sold by two private companies known as OOO Domrabod Savdo and OOO Donlay

---

[23]  Liberty's hearsay objection to the June 9, 2006 claim and settlement demand that Interspan sent to Liberty
is overruled.  (Docket Entry No. 32, Ex. 2-W).  The document  is properly considered for the purpose of
showing what information had been conveyed to Liberty.

Business."  The demand letter asserted that the actions against Eskender Kiamilev and Mikhail Matkarimov constituted extortion because their arrests conveyed to the Interspan principals that the principals would be kidnapped or injured if they returned to Uzbekistan to reclaim their assets.  The demand letter asserted that the actions against Interspan were taken by "government . . . operating outside of the normal channels of law" using "absurd and patently false" allegations of "grand theft," "large illegal cash sales," and "contraband sales."  (*Id.*).  The letter stated that it was "crystal clear to all concerned" that Mikhail Matkarimov would "not be released unless and until Interspan formally surrender[ed] not only its legal rights to its business, including the inventory, physical assets and the entire business operation, but also its right to conduct further business in Uzbekistan." (*Id.*).

The demand letter claimed "Interim Losses" of over $26.4 million.  The losses included $9,594,436.72 for the "market value" of Interspan.  The letter attached a one-page chart to show how this figure was calculated.   The letter also claimed, without providing additional supporting documentation, that Interspan had lost $1,942,995.92 in assets seized at Eskender Kiamilev's arrest; $1,842,091.64 in lost future income for Eric Johnson and Emir Kiamilev; $1,201,006.26 in lost value from the Imperial Teas distribution agreement; $3,397,295.50 in lost future and present value of the Tashkent Tea brand; $1,000,000 in lost goodwill and lost ability to conduct business with suppliers after defaulting on credit lines; $2,000,000 for lost goodwill and lost ability to conduct business with current customers and distributors; $2,000,000 in lost "human infrastructure" of the business network in Uzbekistan; $60,150 in lost salaries for Mikhail Matkarimov, Eskender Kiamilev, Eric Johnson, and Emir Kiamilev for the three months before the claim was filed; $237,000 for lost salaries for the same individuals the following year; $567,239.20 in expenses associated with the detention of Natasha Matkarimova (the letter gave no description of those expenses); and $832,131

in expenses associated with expatriating Johnson's mother-in-law, sister-in-law, and niece from Uzbekistan to the United States and supporting them for the next 40 years.  (Docket Entry No. 32, Ex. 2-W).

### J.      The Reinvolvement of CRI and Matkarimov's Conviction

On June 14, 2006, Johnson sent Rudd an email stating:  "Since you made it clear that any hope of getting our assets out was lost, I am very thankful that you have stuck around for so long just to help us without being paid by anyone."  (Docket Entry No. 54, Ex. C at 242).  When asked during his deposition to explain the email, Johnson testified that "[a]t that time I was surprised that CRI had not been paying him and I knew that we had not paid him and had no intent to ever pay him and no obligation to pay him, so I was surprised that he had been working for free without any hope of being paid by anybody."  (*Id.*, Ex. C at 242–43).

The next day, June 15, 2006, Hildreth faxed Van Wagenen stating that Johnson had asked CRI to "reinitiate its response."  (Docket Entry No. 48, Ex. 1-J).  Hildreth testified that when Johnson contacted him, he "indicated that he did not understand completely that when he asked [CRI] to stand down, that mean[t] [CRI] would stand down everything."  Hildreth maintained that "when we were told to stand down, we made it very clear we were completely standing down as far as CRI was concerned, and we would not do anything more without a request from him."  Hildreth testified that Johnson had not sought advice from CRI during the three-month period between the March 8 stand-down and the June 15 reactivation, although Hildreth had emailed Johnson on several occasions to check on  Matmarikov's detention, out of "personal interest."  (Docket Entry No. 54, Ex. A at 60–63, 167).

In an email sent to Fiacco and Rudd, Hildreth wrote that Johnson had asked CRI to "immediately reinstate [its] response to this case."  Hildreth explained that he had "advised

[Johnson] that we initially stood down on this case on March 8, 2006 and that we have not

proactively conducted any inquiries so as not to interfere with what he stated were efforts on the part

of the attorney to secure the victim's release from jail."   Hildreth asked Rudd to reinitiate his

contacts to provide "a detailed status as to where the victim and the company stand since the 8th."

(Docket Entry No. 54, Ex. A-14).

Rudd emailed Johnson the following day:

> [Hildreth] called yesterday and we chatted for about 30 minutes.  His
> group has been retained by the insurance company and assume will
> be given the task to dig up any info which will support the insurance
> company's position that your claim is outside of their coverage.  You
> will have to balance that with your interest to hep Misha and recover
> your losses.

(Docket Entry No. 32, Ex. 1-H).  Rudd also responded with information about a Harry Eustace:

> Yes, I know Harry Eustace very well and he knows who I am and
> what role I have in the American Chamber of Commerce in
> Uzbekistan as well as my D&B connection.  His organization was a
> member of our chamber until I uncovered data during my
> investigation of his firm and he was forced to change registration of
> his company from the USA to Switzerland to avoid US Government
> action or investigation of his activities in support of the First Family
> here.  Now he sits in London and his company now has a Swiss
> registration.  He may be a member of the Uzbek-American Chamber
> of Commerce which is a political organization which meets once or
> twice a year.  Harry is the "whiteman" face of Gulnara and her
> investments.  Gulnara is the "Brain," Usmanov is the "Muscle and
> experience" and Harry is the "Front and buffer."  Be very careful if
> you choose to contact him.  If I were to contact him I would limit the
> conversation to informing him that you suspect he and ZeroMax are
> behind all the events which are going on now and you consider them
> to be financially and legally responsible for all your losses.  He has
> no sympathy for anyone except himself and his son who is often here
> in Tashkent.  Treat any encounter with him as a "dance with the
> cobra."
>
> Usmanov and Gulnara have had several joint business connections
> and therefore he is directly connected to ZeroMax which has its
> hands on several business sectors in Uzbekistan including Gas and

47

> Oil projects, Sugar and cooking oil manufacturing, imports and distribution, Food processing and export i.e. freezing facilities, Coca Cola, Cement factories . . . .   I am involved in helping in asset recovery for Russian and USA investors in the flour mills who had controlling interest in several of the mills before Gulnara/Usmanov gave order to renationalize them.   Street talk indicates that the Government will reprivatize them in about 2 years and Gulnara/Usmanov will buy the 51% held now by the government. This business generates huge amounts of cash and receivable turnovers. . . .
>
> I suggest you collect all the data you find and later we can combine with what we have and let's create a "Map" of connections between all the players i.e. Gulnara, Usmanov, ZeroMax, etc.  It will be very useful in making your case that this action against you was an illegal action orchestrated by forces outside the normal market arena and not due to any illegal action on the part of you or your distribution team.

(*Id.*).

Hildreth sent another fax to Van Wagenen on July 17, 2006.  Hildreth reported that Rudd had advised Mikhail Matkarimov's family to prepare letters "to all the organizations who are monitoring this process" summarizing "all the actions taken by the arresting agencies, seizure of property [and] funds, . . . failure to secure the warehouses, . . . transfer of goods to private organizations for purpose of sale, lack of due process in the court hearings, lack of medical treatment for Misha, [and] lack of access of Misha to legal counsel."   Hildreth also relayed Rudd's report, stating as follows:

> The lack of a centralized inventory of all goods that were seized makes reconciliation of the bookkeeping almost impossible.  No one seems to have a clear and encompassing knowledge of the make up and total of all goods seized during the arrest process.  All product inventories should match the import and sales documents to prevent the prosecutor from making charges of either contraband (goods in excess of documents) or theft or failure to make tax declarations (shortage of goods).   As it stands now no one can dispute the calculations and claims of the prosecutor.

(Docket Entry No. 48, Ex. 1-J).  Hildreth also included a chronology of CRI's communications with Johnson during CRI's "stand-down" time.  (*Id.*).  Hildreth testified that he included the chronology

48

because he wanted to avoid any implication that Rudd had been "responding as a CRI response team member during that time period."  (Docket Entry No. 54, Ex. A at 190).[24]  The following day, Hildreth forwarded Van Wagenen translated excerpts from the indictment against Mikhail Matkarimov.  (Docket Entry No. 48, Ex. 1-N).

The trial against Mikhail Matkarimov resulted in his conviction on August 11, 2006 of all charges.  According to a notarized and translated copy of the judgment, Matkarimov was sentenced to two years of correctional labor; the withholding and forfeiture of 20% of his wages to the state treasury; and a 4,700,000 soum fine (the equivalent of 500 times the minimum wage).  (Docket Entry No. 32, Ex. 2-V at 9).  In an affidavit, Johnson stated that the judgment named Interspan and identified certain items of Interspan's property confiscated from Mikhail Matkarimov when he was arrested, including "an inventory of tea . . . some cash, traveler's checks, packaging equipment, and other appliances and certain other physical assets" that would not be returned.  (Docket Entry No. 32, Ex. 1 ¶ 24).  But the English translation of the judgment Interspan submitted does not mention Interspan or list these property items.  The English translation does state that Mikhail Matkarimov could not  hold office or engage in entrepreneurial activity for three years.  (Docket Entry No. 32, Ex. 2-V at 9).  The judgment also states:  "[t]he restrictive measure is revoked for M.G. Matkarimov—he is released from armed guard in the court room and until the judgment becomes effective he is released under signed statement of appropriate behavior."  (*Id.*).[25]  Interspan alleged

---

[24]  Hildreth also stated in the July 17, 2006 fax that he would be sending by separate cover copies of all emails exchanged between Johnson and Rudd during the time that CRI was "standing down."  Hildreth testified in his deposition that at his request, Rudd provided the copies after receiving written permission from Johnson to disclose them.  Hildreth testified that he asked for the emails because he "just wanted to . . . see what had gone on, to see if there [wa]s anything I could think that we would recommend, suggest, observations, those types of things that we hadn't been clued in on."  (Docket Entry No. 54, Ex. A at 193–94).

[25]  Liberty objects to the English translation of the judgment against Matkarimov that Interspan included in the summary judgment evidence.  (Docket Entry No. 32, Ex. 2-V).  Liberty objects that the translation, which

49

in its complaint in this lawsuit that two months after his conviction, Mikhail Matmarikov was granted amnesty.  (Docket Entry No. 1 ¶ 116).  Johnson testified in his deposition that even after receiving amnesty, Mikhail Matkarimov was still obligated to pay the fine and was vulnerable to rearrest.  (Docket Entry No. 54, Ex. C at 191–92).[26]

### K.      Liberty's Coverage Denial

On August 21, 2006, counsel for Liberty and PIA sent a letter to Interspan's attorney denying the claim under the Special Coverages policy.  The denial letter stated:

> The claimed LOSS is not a covered Kidnap/Ransom, Extortion
> Bodily Injury, Detention or Extortion Property Damage as those

---

is signed by the translator and notarized, is not properly authenticated because it does not specifically identify the document translated (it refers to the document only as "the original Russian document" and does not clarify that it translates only a portion of the Russian document).  Interspan's attorney stated in his affidavit that the document is a "true and correct copy of an English translation of relevant portions of the judgment that was entered against Mr. Matkarimov and which provides that Interspan's seized property would not be returned."  (Docket Entry No. 32, Ex. 2 ¶ 24).  The requirement of authentication is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  FED. R. EVID. 901. Taken together, the sworn statements of the translator and Interspan's attorney perform this function. Liberty's objection is overruled.

Liberty also objects to the introduction of a copy of the Russian-language version of the full judgment against Matkarimov.  Johnson stated in his affidavit that he "can read Russian and h[as] personally highlighted certain relevant sections."  Johnson also stated that Matkarimov "was released after being convicted on all charges."  (Docket Entry No. 32, Ex. 2 ¶¶ 23, 24).  Liberty objects to the document for lack of authentication, to Johnson's highlighting for lack of information necessary "to evaluate what his reading ability is and how he determined what portions of the judgment were relevant," and to Johnson's statement as to Matkarimov's release on grounds of "lack of the required specificity" and "fail[ure] to disclose the basis for which the witness has personal knowledge."  Liberty's objections to the document and the highlighting are overruled as moot; neither the Russian-language document nor the highlighting are part of the court's analysis.  Liberty's objections as to Johnson's statement about Matkarimov's release are also overruled.  The basis for Johnson's knowledge is his position as a principal of Interspan.  Liberty may challenge the veracity of the statement, but this does not provide a basis for exclusion.

[26]  Liberty also objects to Johnson's affidavit statement that "Interspan lost all of its operations and business assets in Uzbekistan," and that some of Interspan's assets were "lost as a result of the judgment" against Matkarimov, including "inventory tea, some cash, traveler's checks, package equipment, and other appliances and certain other physical assets."  Liberty objects that these allegations are "conclusory" and that there is no "documentary evidence" of the loss.  Liberty's objections are overruled. Johnson claims to be identifying Interspan's seized assets from personal knowledge.  Liberty disputes the veracity of Johnson's statement, but such a dispute does not provide a basis for excluding evidence.

terms are defined by the policy.  Moreover, the policy also provides
a limitation of coverage for the detention arising from the alleged
violations of the laws of the Republic of Uzbekistan per Hazard 3 of
the policy.  Furthermore, there is no evidence presented that the
actions taken by the governmental authorities were arbitrary and
capricious or were intentionally false, fraudulent or malicious.  Nor
is there evidence that such acts were made solely to achieve a
political, propaganda and/or coercive effect.  Indeed, given the fact
that Misha Matkarimov has been found guilty of the charges against
him, it is clear that the police were acting in their official capacity in
furtherance of the state laws and in accordance with due process.

(Docket Entry No. 32, Ex. 1-L).  On September 8, 2006, counsel for Liberty and PIA sent an

additional letter rejecting Interspan's request for mediation.  The letter stated, "it is quite possible

that your client's Political Risk/Contract Frustration policy could respond in this instance.  We

respectfully suggest, therefore, that your client contact their Political Risk carrier if they have not

done so already."  (*Id.*, Ex. 1-M).  Johnson testified that Interspan never had political risk insurance.

(Docket Entry No. 54, Ex. C at 63).[27]  Although Interspan had  a property loss policy in 2006,

Johnson was not sure there was one for 2005 and in any event, such a policy "would not have

covered this situation."  (*Id.*, Ex. C at 67).[28]

---

[27]  Interspan moves *in limine* to exclude any evidence suggesting that Interspan should have purchased
political risk insurance, arguing that it is not relevant and, in the alternative, that its probative value would
be substantially outweighed by the dangers identified in Federal Rule of Evidence 403.  (Docket Entry No.
70).  Evidence regarding political risk insurance is probative on the parties' reasonable understanding of the
extent of Liberty's coverage.  Interspan's Rule 403 argument is not an appropriate objection to summary
judgment evidence.  The motion is denied as to relevance and denied without prejudice as to Rule 403.

[28]  Interspan contends that this court should ignore all evidence that Liberty adduced after denying Interspan's
claim on August 21, 2006.  Interspan argues that Liberty has a fiduciary obligation to investigate claims, and
that Liberty, in essence, should not be permitted to deny first, research later.  Interspan cites Texas Insurance
Code § 541.060(7) and *Viles v. Security National Insurance Co.*, 788 S.W.2d 566 (1990), for the proposition
that an insurer "cannot be allowed to deny coverage without properly investigating their claim and then be
allowed to offer evidence at trial on the very same matters that [they] improperly neglected to investigate .
. . when evaluating coverage for the insured's claim."  (Docket Entry No. 62 at 10).  Interspan's reliance on
these authorities is misplaced.  Section 541.060(7) and *Viles* stand only for the proposition that a failure to
research can support a cause of action for breach of duty of good faith against an insurer.  Under Texas law,
whether the insurer has breached the contract of insurance and whether the insurer breached the duty of good

Emir Kiamilev testified in his deposition that as late as October 2006, Interspan had tried to recover a container of its tea that "maybe wasn't confiscated" and was still in the customs bonded warehouse.   Interspan tried to transfer that container to Uzbegim.   Kiamilev testified that the transfer never occurred, but he did not know why.  (*Id.*, Ex. D at 172–73).

### L.   Publicly Available Documents about Uzbekistan

Interspan has submitted copies of government publications and news reports about Uzbekistan published between 2002 and 2006.   Interspan contends that these documents show that what happened to Eskender Kiamilev, Mikhail Matkarimov, and others connected to Interspan in 2006 were acts of kidnapping for ransom and extortion.   A 2002 United Nations article reports "numerous, ongoing and consistent allegations of particularly brutal acts of torture and other cruel, inhuman or degrading treatment or punishment committed by law personnel"; "[t]he lack of adequate access for persons deprived of liberty, immediately after they are apprehended, to independent counsel, a doctor or medical examiner and family members," and "[t]he insufficient independence of the judiciary."  (*Id.*, Ex. 2-B).   A 2002 article from the World Policy Journal described the business climate in Uzbekistan.   According to the article, "investors have been leaving in droves over the last two years, as urgently needed economic reforms have been repeatedly put off."   One of the problems described was Uzbekistan's refusal "to make its currency, the som, freely convertible.   The official rate is about 430 som to the U.S. dollar.   The black market rate is around

---

faith in denying coverage are separate causes of action, and the viability of the latter is contingent on proof of the former.   "[F]ailure to properly investigate a claim is not a basis for obtaining policy benefits." *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 198 (Tex. 1999); *see also Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 340–41 (Tex. 1995); *Parkans Int'l LLC v. Zurich Ins. Co.*, 299 F.3d 514, 519 (5th Cir. 2002).   Interspan has cited no authority to support the proposition that a failure to properly investigate prevents an insurer from using information generated in discovery to defend against a breach of contract claim.   Liberty's purported failure to investigate before denying coverage does not provide a basis for ignoring the summary judgment evidence that it gathered during discovery.   Interspan's motion *in limine* to preclude this evidence is denied.

1,200.  Only a tiny number of well-connected businesses can buy dollars at the official rate, enabling them to profit handsomely by importing goods for roughly a third of their true value.  Most companies cannot."  (*Id.*, Ex. 2-E).

A 2005 article published by the United States Department of State describes "human rights problems" in Uzbekistan's justice system, including "prison deaths under suspicious circumstances," "lack of due process," "routine and systematic torture and abuse of detainees by security forces," "poor and life-threatening prison conditions," "increased incidents of arbitrary arrest and detention . . . sometimes on falsified charges," and "politically motivated arrests and incommunicado detention."  (*Id.*, Ex. 2-A).  This article also describes the "Andijon Uprising," an event that began as a series of daily peaceful protests in support of 23 businessmen on trial for Islamic extremism.  Uzbek government forces reportedly fired "indiscriminately without warning into the crowd," killing hundreds and jailing hundreds more.  (*Id.*).

Two Central Asian-based news sources reported in 2004 and 2005 that the daughter of the president of Uzbekistan, Gulnara Karimova, was reputed to be the second most powerful person in Uzbekistan.  Karimova reportedly did "not always coordinate her actions with her father and ha[d] created a parallel system of power," "with command over her own judiciary, militia, commando-trained personal guard and intelligence system."  Uzbek authorities had reportedly revoked certain Russian licenses for oil exploration in Uzbekistan and transferred them to Karimova and her company, Zeromax. (*Id.* at 2-H, 2-I).[29]

---

[29]  Liberty objects to the 2002–2006 news reports about Uzbekistan on the ground that "[t]here is no verification as to the authenticity of the information" conveyed in those articles.  (Docket Entry No. 56 at 5–8).  Interspan counters that the articles are not offered for the truth of the facts that they convey but to show that negative stories about Uzbekistan's prison conditions and legal system, and about the influence of Gulnara Karimova, were part of the mix of information that conveyed what would objectively be viewed as a threat to the safety of Interspan's principals and their relatives.  Interspan's attorney has submitted a sworn

The parties agree that the actions against Eskender Kiamilev and Mikhail Matkarimov were carried out through Uzbek government instrumentalities.  (Docket Entry No. 90 at 19, 34–35).  The parties dispute, however, "whether or not these were official acts [by the] sovereign, acting in its official capacity or within an official mandate."  (*Id.*).  Interspan argues that the information available to it at the time it surrendered its business interests and assets in Uzbekistan was that "this was not an official act" but instead "[v]ery powerful people who were the owners of a competing tea company who were powerful enough to manipulate government instrumentalities as pawns in order to achieve their objective of [ac]quiring Interspan's business."  (*Id.*).  Interspan contends that it is the information available at the time the ransom or extortion payment is made, not the ultimate accuracy or truth of that information, that is relevant to coverage under the Special Coverages Policy.  (*Id.* at 22).

Liberty raises several threshold issues, including whether the act of state doctrine precludes the relief that Interspan seeks, and whether CRI was an agent for Liberty and whether Rudd in turn was an agent for CRI.  As to the substance of Interspan's coverage argument, Liberty counters that the information available to Interspan at the time Interspan surrendered its business interests was not sufficient to show an extortionate threat.  Liberty argues that much of the information upon which Interspan relies to show an extortionate threat originated from Interspan itself or from Rudd after he was communicating directly with Interspan and may have had a financial interest in recovery under the Special Coverages Policy.  Liberty also argues that much of the information

---

affidavit authenticating the source of the documents.  (Docket Entry No. 32, Ex. 2).  This is sufficient for the purpose for which Interspan has cited these documents.  *See Rearden LLC v. Rearden Commerce, Inc.*, 597 F. Supp.2d 1006, 1027 (N.D. Cal. 2009) (attorney's declaration that documents had been printed from a public website were sufficient to authenticate the documents where the attorney's declarations were "not offered for the purposes of testifying to the substance of the various news articles and documents" but to "authenticate the source of those documents").

54

available to Interspan at the time it surrendered its business suggested that the arrests and prosecution were in fact legitimate, citing "the apparatus of government; clear evidence that more than one department of the government was involved in the investigation; evidence that there was in fact an investigation done prior to these arrests, or at least reported to have been done; . . . [and] official records," including the judgment and conviction. (Docket Entry No. 90 at 15–16).  Liberty also suggests that the possible legitimacy of the legal action could implicate the "Collusion and Fraud" exclusion of the Special Coverages Policy.

The parties' arguments are analyzed in light of the summary judgment evidence and under the applicable law.

## III.    The Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State*

*of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## B.    Contract Interpretation

The parties agree that Texas law applies to the Special Coverages Policy.  The Policy was issued by a Texas broker to an Interspan address in The Woodlands, Texas.  The Policy contains several endorsements tailored to Texas law.

Under Texas law, in interpreting an insurance policy, a court applies the rules for interpreting contracts, reading all parts of the document together and exercising caution not to isolate particular sections or provisions.  *Provident Life & Accident Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (citations omitted); *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 537 (5th Cir. 2002); *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000).  Viewing the policy in its entirety allows a court to give effect to the written expression of the parties' intent.  *Id.* (citing *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999)).  In interpreting the policy, a

56

court must read all parts together, giving meaning to each sentence, clause, and word, to avoid making any portion inoperative. *Id.* at 748. The parties' intent "is governed by what they said, not by what they intended to say but did not." *Id.* at 746. The terms used in an insurance contract are given their ordinary and generally accepted meaning, unless the policy shows the words were meant in a technical or different sense. *See Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir. 1996); *Security Mut. Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979).

A court construes an unambiguous policy as a matter of law. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006). If a policy provision is uncertain or doubtful or is reasonably susceptible to more than one reasonable interpretation, it is ambiguous. *Id.*; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). An ambiguity does not arise simply because the parties offer opposing interpretations. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain its meaning. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). The meaning of an ambiguous contract is a question of fact. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980).

The insured initially has the burden to plead and prove that the benefits sought are covered by the insurance policy at issue. *See Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *W. Alliance Ins. Co. v. N. Ins. Co.*, 176 F.3d 825, 831 (5th Cir. 1999). The insurer bears the burden of establishing that one of the policy's limitations or exclusions constitutes an avoidance or affirmative defense to coverage. *See Harken Exploration Co.*, 261 F.3d at 471;

*Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998); *Canutillo Indep. Sch. Dist.*, 99 F.3d at 701.  Once the insurer demonstrates that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion.  *See Vic Mfg. Co.*, 143 F.3d at 193; *Telepak v. United Servs. Auto. Ass'n*, 887 S.W.2d 506, 507–08 (Tex. App.–San Antonio 1994, writ denied).

## IV.    The Coverage Issues

### A.    The Act of State Doctrine

Liberty contends that the act of state doctrine precludes coverage as a matter of law.  Liberty argues that Eskender Kiamilev and Mikhail Matkarimov were arrested by Uzbek police after investigation by Uzbek government authorities and that Matkarimov was convicted in an Uzbekistan court of law on Uzbek statutory violations.  Liberty argues that to find that the Special Coverages Policy applies, this court would need to declare an official act of the Uzbekistan government invalid. Interspan counters that the act of state doctrine is not implicated because the information available to Interspan when it relinquished its business was that the arrests, imprisonments, and conviction were threats amounting to extortion.  Interspan contends that the Special Coverages Policy applies if the information available to the insured when the extortion payment is made was reasonably understood as conveying a threat of extortion, even if that information later proves erroneous.

The act of state doctrine "limits, for prudential rather than jurisdictional reasons, the adjudication in American courts of the validity of a foreign sovereign's public acts."  *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines*, 965 F.2d 1375, 1387 (5th Cir. 1992).  It "serves to enhance the ability of the Executive Branch to engage in the conduct of foreign relations by preventing courts from judging foreign public acts."  *Id.* (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).  "When determining whether the act of state doctrine limits

58

adjudication in American courts, we look not only to the acts of the named defendants, 'but [to] any governmental acts whose validity would be called into question by adjudication of the suit.'" *Id.* (quoting *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1981)). "Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign.  When that question is not in the case, neither is the act of state doctrine."  *W.S. Kirkpatrick & Co. v. Env'tl Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (emphasis in original); *see also Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 372 n.14 (5th Cir. 2004) ("[T]he act of state doctrine applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nation.").

Hazard 2 of the Special Coverages Policy provides coverage for "LOSS," defined as "the sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the INSURED as a[n] . . . extortion payment" incurred "by reason of the receipt of a threat, communicated directly or indirectly to the INSURED to kill, injure or KIDNAP an Insured Person [or] RELATIVE." (Docket Entry No. 32, Ex. 1-A at 15–16).  The Policy does not define "threat."

Under the Special Coverages Policy, Liberty promised to reimburse, or indemnify, the insured for "LOSS" it incurs by making a certain kind of payment—an extortion payment—in response to such a threat.  "Under Texas law, where an indemnitee enters a settlement with a third party, it may recover from the indemnitor only upon a showing that potential liability existed, and that the settlement was reasonable, prudent, and in good faith under the circumstances."  *XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 513 F.3d 146, 152.  If these elements are met, "the settling indemnitee need not prove actual liability before recovering from the indemnitor."  *Id.* (internal quotations omitted) (quoting *Ins. Co. of H. Am. v. Aberdeen Ins. Servs.*, 253 F.3d 878, 888 (5th Cir. 2001)).  This is not a "subjective standard," as Interspan proposed at the summary judgment

59

hearing.  (Docket Entry No. 90 at 48).  Neither the Policy nor the case law permits coverage simply because the insured subjectively determined that it received a qualifying threat and made an extortion payment in response.  The insured must have an objectively reasonable belief that the threat communicated was a threat to "kill, injure or KIDNAP an Insured Person [or] RELATIVE," and, in response, make an extortion payment.  The Policy provides coverage if a threat was indirectly or directly communicated to Interspan that it reasonably understood as a threat to  "kill, injure or KIDNAP an Insured Person [or] RELATIVE," and if Interspan in response made an "extortion payment" that was "reasonable, prudent, and in good faith under the circumstances."

Contrary to Liberty's assertions, to determine coverage, this court need not "delve into the motivations of these government agents" who carried out the arrest and detention of Eskender Kiamilev and the arrest, detention, prosecution, and conviction of Mikhail Matkarimov "and determine that their actions were invalid because they were acting to enrich themselves rather than carry out their official duties."  (Docket Entry No. 39 at 10).  This court need only examine the information available to Interspan when it made what it characterizes as an extortion payment – the surrender of its business interests and assets in Uzbekistan – and determine whether that information was understood as showing a "threat" to "kill, injure or KIDNAP an Insured Person [or] RELATIVE,"   and whether that understanding was objectively reasonable.  Because this determination does not "turn on the effect of official action by a foreign sovereign," the act of state doctrine does not preclude the relief Interspan seeks.  *Kirkpatrick*, 493 U.S. at 406.

This holding is consistent with *Kirkpatrick*, in which the Supreme Court concluded that the act of state doctrine did not preclude relief in a RICO suit against a private-party defendant that was alleged to have bribed the Nigerian government to procure a contract, to the detriment of the plaintiff, an unsuccessful bidder for the contract.  The Court noted that "[r]egardless of what the

60

court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit." *Id.*

This court's holding is also consistent with Fifth Circuit authority. In *Perenco Nigeria Ltd. v. Ashland Inc.*, 242 F.3d 299, 306 (5th Cir. 2001), the plaintiff had sought to purchase stock in a company with oil interests in Nigeria and claimed that the defendant had breached the terms of the proposed sale. The plaintiff alleged that the defendant had represented that Nigeria's Minister of Petroleum had "no objection" to the proposed sale. After the stock purchase agreement was signed, the Prime Minister of Nigeria took extensive steps to stop the sale, despite efforts by both parties, "the United States Department of State, the White House, and members of the United States Congress" to reverse the Minister's position. *Id.* at 303. The Fifth Circuit concluded that the act of state doctrine did not apply to preclude the plaintiff's claim because the defendant's "alleged misrepresentation turns on its own knowledge of the Minister's position on the sale prior to the signing of the SPA, and not on the legality or 'validity' of the Minister's subsequent actions with respect to blocking the sale, much less the legal technicality of his authority to approve or disapprove of the transaction." *Id.* at 306 n.28. Similarly, in *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines*, 965 F.2d at 1387, the Fifth Circuit concluded that the act of state doctrine did not preclude a suit filed by an American purchaser of an aircraft against the seller, the Republic of the Philippines and the Philippines Presidential Commission on Good Government. The contract of sale provided that the Philippine government would hold the purchaser harmless from any claims asserted against the aircraft. A party claiming an ownership interest in the aircraft sued the purchaser and won. The Philippine government refused to pay the purchaser's defense and other costs, citing, among other grounds, the act of state doctrine. The purchaser sued the Philippine government to recover its costs, asserting breach of the indemnity contract. The Philippine

government argued that the act of state doctrine applied because resolving the suit would "call into question the Philippine government's . . . power . . . to sequester and sell assets; the [government's] official acts of sequestering and selling the [aircraft]; the Philippines Supreme Court's decision that the [government] had no authority to sell the aircraft and that the proceeds of the sale should be placed in escrow until title is determined, and various other official acts." *Id.* at 1388. The Fifth Circuit rejected the argument, concluding that the purchaser's suit "ha[d] nothing to do with title to the aircraft, but [wa]s instead a damages action arising from a contract breach." *Id.* "[A]ll the public acts and decisions cited by the defendants may be valid and yet the [government] still may have breached the contract," despite the facts that "public acts lurk in the background." *Id.*

The cases that Liberty cites are not to the contrary. Liberty cites *Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322 (5th Cir. 1982) and *Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977), for the proposition that the act of state doctrine may apply even if the legal question presented does not directly turn on the effect of an act by a foreign sovereign. But these cases were decided before the Supreme Court opinion in *Kirkpatrick.* And although no foreign government was a party in *Entex* or in *Hunt*, the legal issues presented in these cases required at least a finding that the governments had *actually* participated with the private-party defendants in an illegal activity. *See Entex*, 686 F.2d at 325–26 (resolution of the claim "would require a determination of the validity of the Mexican government's actions); *Hunt*, 550 F.2d at 77 (the plaintiff's claim would "inevitably" require the court to inquire into the motivations for and validity of Libya's actions). In the present case, by contrast, this court does not have to find that the Uzbekistan government was involved in illegal activities with private parties, or that Uzbekistan officials acted with improper motives, to reach a determination as to coverage. The sole focus of the inquiry is whether Interspan

62

had an objectively reasonable *belief* that it was faced with a covered threat when it decided to give up its business interests and assets in Uzbekistan.

Liberty also cites *Nocula v. UGS Corp.*, 520 F.3d 719, 728 (7th Cir. 2008). In that case, the court considered a seizure of property by the Polish police during the investigation of a criminal complaint initiated by the defendant. The act of state doctrine applied; the court would have to determine that the seizure was unlawful to decide the legal issue presented. Similarly, in *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1075 (C.D. Cal. 1999), the court had to determine whether an official order from the Burmese military had required the plaintiff to work as a forced laborer, which was unlawful. In the present case, in contrast to both *USG* and *Unocal*, there is no need for this court to determine whether the Uzbekistan government officials in fact used their authority unlawfully to obtain Interspan's tea business and assets for the President's daughter, who had a competing business, in order to enrich themselves. Instead, the issues are whether Interspan understood the information they received as a threat to "kill, injure or KIDNAP an Insured Person [or] RELATIVE," whether that understanding was objectively reasonable, and whether Interspan in response made an "extortion payment" that was "reasonable, prudent, and in good faith under the circumstances."

Interspan does not argue that coverage would apply under Hazard 2 of the Special Coverages Policy if the information available at the time it surrendered its business, viewed reasonably and objectively, showed that the Uzbekistan government officials were acting as government official—as opposed to private agents seeking private gain for private business—in arresting and detaining Eskender Kiamilev and in arresting, detaining, and prosecuting Mikhail Matkarimov for violating Uzbek law. If the coverage determination required determining whether the exercise of government authority was valid, the act of state doctrine would apply, even if information in the

record showed that the available legal process or prison conditions were inconsistent with American notions of due process and constitutional protections.  (Docket Entry No. 90 at 19, 36–37).  This is consistent with other Policy provisions.  The Policy does not cover losses from "DETENTION resulting from . . . any violation or alleged violation of the laws of a host country," unless Liberty "determine[s that] such allegations were intentionally false, fraudulent and malicious and made solely to achieve a political, propaganda and/or coercive effect."  (Docket Entry No. 32, Ex. 1-A at 15–16).  And the Policy excludes coverage for "LOSS and/or expense due to fraudulent, dishonest or criminal act by an Insured Person, RELATIVE, GUEST or authorized representative . . . unless the person authorizing payment of the LOSS and/or expense had, prior to payment, made every reasonable attempt to determine that the ransom demand or threat was genuine."  (*Id*., Ex. 1-A at 22).

As in *Perenco* and *Walter*, this court need not reach the validity of the act of state in question in order to reach a coverage determination under the Special Coverages Policy.  Liberty's motion for summary judgment as to the application of the act of state doctrine is denied.

### B.        The Agency Status of CRI and Rudd

Liberty has moved for summary judgment that CRI was not an agent of Liberty "for any purpose other than receiving notice of loss under the Policy," and that Rudd, in turn, was not an agent of CRI.  Liberty argues that CRI and Rudd were independent contractors, pointing to the lack of evidence that Liberty "had the right to assign their tasks and to control the means and details of how they accomplished those tasks," (Docket Entry No. 40 at 2–3).  Liberty also contends that Interspan improperly tried to attribute actions and statements by CRI and Rudd to Liberty.  Interspan counters that CRI and Rudd were in fact agents but correctly points out that the agency issue bears little relevance to the issue on which coverage turns: whether the information conveyed by Liberty

64

and Rudd, as part of the total mix of information available to Interspan, conveyed what would have been objectively reasonable to view–and was viewed by Interspan–as a "threat" for which an extortion payment was a reasonable response.

"A question of agency is generally one of fact, and one may be an independent contractor under some circumstances yet may be an agent or employee in connection with other work or activities." *Lyons v. Lindsey Morden Claims Mgmt., Inc.*, 985 S.W.2d 86, 90 (Tex. App.–El Paso 1998, no pet.). "Agency will not be presumed. To prove agency, evidence must establish that the principal has both the right: (1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task. It is the principal's extent of control over the details of accomplishing the assigned task that primarily distinguishes the status of independent contractor from that of agent." *Happy Indus. Corp. v. Am. Specialities, Inc.*, 983 S.W.2d 844, 852 (Tex. App.–Corpus Christi 1998) (internal citations omitted).

### 1.    CRI

Liberty does not dispute that the Special Coverage Policy designates CRI as an agent for purposes of receiving notice of loss on behalf of Liberty. The agreement between PIA and CRI did not permit CRI to do work for any insurer other than PIA (although CRI was free to work for uninsured clients). The agreement required CRI to provide "manpower" and "consulting" to PIA insureds that contacted CRI. But there is otherwise scant evidence that CRI functioned as an agent of Liberty or PIA. Hildreth testified that if a policy holder requested assistance, CRI would respond unless it was told not to do so, and neither Liberty nor PIA would be involved in managing the details of that response. (Docket Entry No. 54, Ex. A at 13–16). The record evidence shows that PIA's interaction with CRI was limited to requesting and receiving updates and informing CRI whether PIA could continue providing consulting services to the insured. The record also supports

Hildreth's testimony that CRI did not see its customers' insurance policies and played no role in making coverage determinations.  As another court has noted, PIA is "not . . . involved in the day-to-day handling of any kidnapping and will not make any substantive decisions regarding strategy or payment of ransom."  *Hargrove*, 937 F. Supp. at 598.

Interspan cites the fact that the agreement with PIA required CRI to maintain certain basic professional standards and to provide limited marketing assistance.  But a hiring party may "establish general rules and standards without disrupting the independent contractor relationship."  *Lopez v. Rosewood Real Estate Equities*, 05-97-00215, 1999 WL 562709, at *3 (Tex. App.–Dallas Aug. 3, 1999, no writ) (citing *Zarate v. Brownsville Navigation Dist.*, 768 S.W.2d 393, 398 (Tex. App.–Corpus Christi 1989, no writ).[30]  In any event, Interspan concedes that "agency is not material to [its] affirmative motion" because the only issue relevant to determining coverage is whether the information that CRI conveyed to Interspan, in conjunction with other information available to Interspan, showed what would objectively and reasonably be understood as a threat within the Policy's coverage.

The Special Coverages Policy instructed the insured, Interspan, to report "losses" to CRI.  The consultant agreement between PIA and CRI required it to "supply appropriate man-power to respond and render consulting services upon the request of PIA, its clients, [and] insureds."  (Docket Entry No. 52, Ex. 4).  CRI would be an objectively reasonable source from which an insured could

---

[30]  Interspan also cites Texas Insurance Code § 4001.051(b)(9) for the proposition that as a matter of Texas law, "a person is the agent of the insurer for which the act is done . . . if the person . . . (9) examines into, adjusts, or aids in adjusting a loss for or on behalf of the insurer."  But Interspan omits that this definition applies only "for purposes of the liabilities, duties, requirements, and penalties provided by *this title*,"—a regulatory title that imposes certain licensing and certification requirements on insurance "agents."  *Id.* Section 4001.051 does not resolve the issue of CRI's or Rudd's agency status in this case.

derive advice and information, regardless of whether it was functioning as Liberty's agent or as an independent contractor.

Although it has no direct bearing on the coverage issues, Liberty held CRI out as an agent for purposes of loss reporting, but otherwise maintained an independent contractor relationship with CRI.  Liberty's motion for summary judgment as to CRI's agency status is granted.

### 2.    Charles Rudd

The parties dispute whether Rudd was CRI's agent.  Hildreth confirmed in his deposition that he considered Rudd to be part of the "appropriate manpower" that CRI was required to provide under its agreement with PIA.  (Docket Entry No. 54, Ex. A at 93).  On February 20, 2006, Hildreth introduced Rudd via email to Johnson as "our representative in Tashkent."  (Docket Entry No. 32, Ex. 2-L).  There is evidence in the record, in short, that CRI held Rudd out as an agent, although there is scant evidence that CRI controlled the means and details of Rudd's work.

Between February 22 and February 27, 2006, however, it is clear that Rudd was neither an agent nor an independent contractor for CRI, and it is equally clear that Interspan understood that he was not.  On February 22, Johnson emailed Rudd asking whether he would be willing to work directly for Interspan in return for 5% of any assets recovered from the government.  Johnson added: "If you are agreeable to such a relationship, we would need to determine . . . the best way to deal with CRI.  I'm not sure of your relationship with them. . . . I do not want to do an end-around and cut them out of the loop . . . [b]ut we simply cannot afford to pay their per diem."  (Docket Entry No. 54, Ex. C-64).  Rudd responded: "I have no contract relationship to CRI.  We were retained by their Dubai agent on an ad hoc basis.  My assignment ended last night when Eskender was put on his flight."  Rudd accepted Johnson's offer to work for 5% of the funds recovered, provided that

67

Interspan pay his expenses up front. (*Id.*, Ex. C-65). Johnson replied that he accepted Rudd's terms, although he later testified that the agreement was never finalized. (*Id.*, Ex. C-66).

After being notified on February 27, 2006 of Mikhail Matkarimov's arrest, CRI asked Rudd to resume work on the Interspan case. Rudd asked Johnson how to respond to CRI's request. Johnson responded that he would "rather that it not be mentioned that we have an arrangement with you." Johnson also indicated that as far as he was concerned, CRI "would be hiring [Rudd] to work on Misha's case," while Rudd would be "working with [Interspan] regarding the assets." (Docket Entry No. 54, Ex. C-75).

On March 8, 2006, Hildreth ordered CRI and Rudd to "stand down" after Johnson called Hildreth with news that a third party had offered to fix Interspan's problems with the government for $500,000. All parties agree that "stand down" meant, at a minimum, that CRI would not do anything to interfere with the deal. The parties dispute whether "stand down" also meant that CRI would drop out of the case entirely (Hildreth's interpretation) or merely that CRI would "hold tight" and "continue monitoring" (Johnson's interpretation). The record shows that Hildreth emailed Johnson five days later, on March 13, 2006, requesting an "update so I can continue to advise [Rudd] as to the status even though we are standing down at this time per your instructions." (Docket Entry No. 54, Ex. B at 52–54). The record contains numerous emails from Rudd to Johnson between March 8, 2006 and June 15, 2006, the day CRI "reactivated," providing detailed updates on the case. The record contains no such emails from Hildreth to Johnson during that same time period, although Hildreth had routinely provided such emails when CRI was "active" on the case. The parties do not dispute that Rudd did not bill CRI for his work during this time. (Docket Entry No. 54, Ex. A at 241).

This sequence of events raises several questions about Interspan's contention that it decided that it faced a threat of a killing, injury, or kidnapping, of an "Insured Person [or] RELATIVE," making an extortion payment reasonable, based largely on the advice of CRI and Rudd. The record makes clear that Rudd was not representing CRI in any capacity between February 22 and 27, 2006, a fact that Interspan clearly understood. The record shows that Rudd was reporting directly to Interspan as well as to CRI between February 27 and March 8, 2006. The record discloses a disputed fact issue as to whether Rudd was representing CRI at all between March 8 and June 15, 2006. It is clear that for the entire period between February 22 and June 15, 2006, Rudd was communicating directly with Interspan, often without CRI's knowledge. There is evidence that some of the reports Rudd passed along to CRI during that time were based upon information Interspan provided. The evidence is unclear as to whether Rudd had a financial interest in any recovery by Interspan during that time.[31] In sum, the relationship between Interspan and Rudd calls into question whether the information Rudd conveyed after February 22, 2006 is properly attributed to CRI. This relationship also raises a fact issue as to whether there was an objectively reasonable basis for Interspan to conclude that the information CRI conveyed during that time showed a threat to "kill, injure or KIDNAP an Insured Person [or] RELATIVE," and that it was response made an "extortion payment" that was  reasonable, prudent, and in good faith under the circumstances  for Interspan to make an "extortion payment" in response.

---

[31]   Interspan has moved *in limine*, based on Johnson's deposition testimony that there was no such financial arrangement, to preclude any evidence of such arrangement. But the emails in the record create a fact issue as to the existence of such an arrangement. Interspan also contends that evidence of such an agreement should not be allowed because Liberty only adduced this evidence after denying Interspan's claim. But as discussed above, the failure to conduct an adequate investigation is only relevant to a claim for breach of duty of good faith. It does not preclude the introduction of evidence for the purposes of assessing the breach of insurance contract claim. *Provident*, 988 S.W.2d at 198; *Stoker*, 903 S.W.2d at 340–41; *Parkans*, 299 F.3d at 519. Interspan's motion *in limine* to preclude evidence of a financial agreement between Rudd and Interspan is denied.

The disputed issue as to CRI's "stand down" after March 8, 2006 also bears on Interspan's argument, aired in its reply in support of its summary judgment motion, that if Interspan reached an incorrect decision about the validity of the threat, it was because CRI failed to provide adequate research and information.  (Docket Entry No. 62 at 7–11).  If Interspan in fact asked CRI not to be involved at all during this time period—which is disputed—there is no basis for this argument.

Although it has no direct bearing on the coverage issues, Rudd's work for CRI was as an independent contractor, not an agent.  Liberty's motion for summary judgment is granted as to Rudd's status as an agent.

### C.    Hazard 2—Extortion Bodily Injury

The parties dispute whether the summary judgment evidence shows that the information available to Interspan when it surrendered its Uzbekistan business assets and interests, viewed from an objectively reasonable standpoint, showed a threat to "kill, injure or KIDNAP an Insured Person [or] RELATIVE," and whether Interspan made an "extortion payment" that was "reasonable, prudent, and in good faith under the circumstances."  Interspan contends that the information it received, including the reports relayed by CRI and the government publications and news reports in the public record, led it to conclude, on an objectively reasonable basis, that members of Uzbekistan's most powerful family threatened to "kill, injure or KIDNAP an Insured Person [or] RELATIVE."  Liberty counters that much of the information Interspan points to as evidence of the threat was generated by Interspan itself or by Rudd after he began receiving information directly from Interspan and had a financial interest in Interspan's recovery.  Liberty argues that some evidence in the record suggests that the actions against Eskender Kiamilev and Mikhail Matkarimov may have been legitimate applications of Uzbek law, evidenced in particular by the fact that Kiamilev and Matkarimov were charged with underinvoicing, a practice in which Interspan engaged

(though the parties dispute whether the practice was illegal).  Liberty contends that if Interspan knew at the time of the arrests that it was violating the law and had good reason to suspect that the arrests were legitimate, the available information when it surrendered its business did not reasonably and objectively show a covered threat and Interspan did not make an "extortion payment."  Liberty also contends that the evidence suggests that the "Collusion or Fraud" exclusion applies.  Liberty further contends that Interspan has not met its burden of proving a "LOSS" resulting from the alleged extortion.

### 1.    Whether Interspan Concluded that the Information it Received Showed a Covered Threat and Whether that Conclusion Was Reasonable

Hazard 2 covers "LOSS"—defined as "the sum of monies or the monetary value of any other consideration surrendered by, or on behalf of, the INSURED as a[n] . . . extortion payment"— incurred "by reason of the receipt of a threat, communicated directly or indirectly to the INSURED ."  (Docket Entry No. 32, Ex. 1-A at 15).  Interspan contends that over the course of events between Eskender Kiamilev's arrest in February 2006 to Mikhail Matkarimov's conviction in August 2006, "CRI communicated to Interspan, in no uncertain terms, that certain powerful individuals—including, in particular, Gulnara Karimova, the daughter of Uzbekistan's president—were attempting to force Interspan into surrendering its business in Uzbekistan."  (Docket Entry No. 32 at 3).  Interspan argues that CRI conveyed to it that the arrests and detentions of Eskender Kiamilev and Mikhail Matkarimov were "illegal" and done at Gulnara Karimova's behest, and that the two men could be held indefinitely with no medical care for their serious medical conditions.  (*Id.*).

71

Interspan contends that the following communications from Hildreth conveyed what was objectively and reasonably understood as a threat "to kill, injure or KIDNAP an Insured Person, RELATIVE OR GUEST":

- The February 20, 2006 email in which Hildreth reported that Eskender Kiamilev was under the care of Dr. Jan Reimer at Tashkent International Medical Clinic in serious but stable condition.  Hildreth reported that the doctor recommended "stenoses surgery" and wanted to transport Kiamilev out of the country for the surgery but was meeting resistance from local doctors who believed they could perform the surgery in Uzbekistan. (Docket Entry No. 32, Ex. 1-C).

- The February 20, 2006 email from Hildreth to Fiacco in which Hildreth stated that he had advised Johnson to "consider putting up the company/inventory as a bond" in exchange for Kiamilev's release.  Hildreth commented that "[o]bviously the victim will never return and the company will lose its inventory and warehouses/offices, but that is going to happen anyway."  (Docket Entry No. 32, Ex. 2-M).

- The February 21, 2006 email from Hildreth to Johnson in which Hildreth advised that Vissaryon, Rudd's legal contact, had opined that there was no "legal basis to charge Eskender for any crime" if the business structure that Johnson had described to Rudd was in place.  Hildreth also forwarded Rudd's comment that "[t]he Samarqand Tea Factory is the primary raw tea processor and monopoly supported by the state and has drawn the interest of the first family. . . .  If the state or Samarqand Tea can dismantle the Interspan network then I think any personal interest in holding Eskender will disappear."  (Docket Entry No. 32, Ex. 1-D).

Interspan also points to emails it received from Rudd (and from Hildreth reporting Rudd's findings) after Interspan's proposed 5% bargain with Rudd:

- The March 2, 2006 email in which Rudd advised Johnson that he had received information that narcotics investigators wanted to connect Interspan to dealings in narcotics and also wanted to "somehow connect the company to events or finance of participants in the Andijan incident." Rudd also reported that Matkarimov had been transferred to the "Sezo Investigatory Isolation Ward," denied access to his attorney, and received no response to a request for treatment for his bleeding ulcer, all in violation of Uzbek law. (Docket Entry No. 32, Ex. 1-G).

- The March 2, 2006 email from Hildreth to Rudd in which Hildreth states that he told Johnson that "with the detention of Eskender and then Misha, [Interspan] can expect other family members or Interspan associates to suffer the same ordeal, until the company resolves their status with the government."  (Docket Entry No. 32, Ex. 2-Q).

- The March 7, 2006 from Rudd, forwarded by Hildreth to Johnson, stating that Rudd's contact believed that the action against Interspan "was requested by Mirabror Usmanov . . . the current beneficial owner of Samarqand Tea," in order "to break the Interspan network and put them out of business."  Rudd also relayed that "[t]he current investigative priority is to build a case against all USA citizens involved in the business which could be the basis of an extradition request."  (Docket Entry No. 32, Ex. 2-R).

- The March 25, 2006 email from Rudd to Johnson stating that "[i]t is becoming clearer to me that [Matkarimov] is being held as a hostage because he is related to you and nothing else.  No formal charges have been presented."  (Docket Entry No. 32, Ex. 2-S).

- The April 1, 2006 email from Rudd to Johnson stating that "[t]he whole process surrounding [Matkarimov's] arrest is illegal but we must understand we are in a country where there is only one law—"The law of the lord of the manor." . . . [Matmarikov] is just a hostage to be used to extract the maximum from you and the rest of the family."  (Docket Entry No. 32, Ex. 2-T).

- The April 19, 2006 email from Rudd to Johnson advising that "[i]t is obvious that the Prosecutor, Court etc. does not care about legal niceties and they are just focusing on one goal of shutting down the network and grabbing the inventory."  (Docket Entry No. 32, Ex. 2-U).

-

Interspan contends that the communications it received from Hildreth and Rudd were consistent with reports in the public record that Uzbekistan's "security service acts as a commercial structure in close coordination with . . . Gulnara Karimova"; that Uzbekistan's first family "[a]ttack[ed] the successful businesses in the country . . . forc[ing] them to give away their business for nothing"; and that Gulnara Karimova "d[id] not always coordinate her actions with her father and ha[d] created a parallel system of power," complete with "her own judiciary, militia, commando-trained personal guard and intelligence system."  (Docket Entry No. 32 at 8–9).

Interspan points to reports that the members of this parallel system of law enforcement were known to commit "particularly brutal acts of torture and other cruel, inhuman or degrading treatment or punishment," and that those imprisoned were often denied access immediately after apprehension "to independent counsel, a doctor or medical examiner and family members." (*Id.* at 7). Interspan argues that the prospect of being connected the "Andijon Uprising," which news reports described as a government crackdown on peaceful protestors supporting 23 businessmen on trial for being Islamic extremists, including killing some of the protestors and arresting many more, added urgency to the threat. (*Id.* at 6). Interspan argues that the information it was given led it reasonably to conclude that powerful Uzbek business interests were threatening to kill, injure or kidnap individuals related to Interspan principals and that in response, Interspan made an "extortion payment" in surrendering its business that was "reasonable, prudent, and in good faith under the circumstances."

Liberty disputes that the information available to Interspan between February 2006 and August 2006 would objectively and reasonably be understood as a covered threat. Liberty argues that evidence in the record shows that the arrests and prosecution—which were based on charges that Kiamilev and Matkarimov participated in "fraudulent business structures" that imported "tea and other products" and sold those goods "for cash, which was not deposited as required by law," and "avoid[ed] taxes and customs fee payments"—were legitimate. Liberty also suggests that if in fact Interspan broke Uzbekistan law, the "Collusion or Fraud" exclusion might be triggered.

There is evidence that Interspan feared what an official review of the company's paperwork would reveal. Less than a week before Eskender Kiamilev's arrest, Emir Kiamilev ordered Bakhrom to "clean out all offices of all information that can link us in any way," especially "financial data," and to "take any other pre-cautions that you think might need to be taken in case of planned raid."

74

(Docket Entry No. 54, Ex. D-188).  After the arrest, Bakhrom commented that "things w[ould] be bad" once investigators started to review documents seized from Eskender Kiamilev's flat and urged that removing certain documents was "highly urge[nt]."  (*Id.*, Ex. C-126).  There is also evidence that Interspan had unexplained and potentially illegal cash holdings in Uzbekistan.  When Eskender Kiamilev was arrested, between $35,000 and $40,000 in cash was found on his person and premises. Rudd characterized this as a "major problem."  (Docket Entry No. 32, Ex. 1-E).

There is also evidence that there may have been legal problems with Interspan's operations and business structure.  Rudd argued to Johnson that Mikhail Matkarimov should not claim responsibility for "undocumented tea"—tea that "was already sold according to the books"—sitting in Interspan warehouses.  Rudd argued that this would leave Matkarimov "holding the bag when they ask why it is there if the books show it has been sold.  Questions like where is the money from the recorded sales, etc. will be posed to Misha."  (Docket Entry No. 32, Ex. 2-T).  Rudd later wrote:

> You are in absolutely no position to prove that the goods belong to Interspan. . . .  I would strongly be opposed to any action which you could not prove with export documents, import documents, customs declarations or signed contracts.  Yes, the goods may be morally yours but the document trail I have seen clearly show[s] the ChPs are the owners.  They may have some credit obligations but this is not supported by documentation or contracts.  I think you would seriously complicate the situation if you made any claims that the goods were in fact belonging to Interspan and not ChPs and would confirm that you had set up a false business structure designed to defraud the government out of tax revenue etc.  This action would put the ChPs in jeopardy by undermining their claims that the goods were theirs and imported legally.

(Docket Entry No. 54, C-104).  Rudd stated in another email that he had confirmed, after a conversation with Bakhrom, that Interspan had participated in "operations via a tax fee 'fund' . . . which had business connections with Kazakh exporters."  Rudd advised that Johnson "review all

tea operations that might have gone via that channel to make sure all are closed and you can cover your 'ass.'" (Docket Entry No. 54, Ex. D-184).

Emir Kiamilev confirmed in his deposition that Interspan "underinvoiced" its tea imports. (Docket Entry No. 54, Ex. D at 128–140). Emir Kiamilev contended that the practice was legal—even required. But Rudd commented that selling underinvoiced tea to other distribution chains would be "difficult," (Docket Entry No. 32, Ex. 1-E), and early in his representation of Interspan urged the company " to begin to collect Dubai export documents showing value of tea exported to Uzbekistan to prove you did not clear customs here with undervalued invoices," (Docket Entry No. 54, Ex. C at 159–160). Rudd reported that Matkarimov's prosecutor contended "that the Interspan network . . . under-declared value during Customs clearance and sold at five times actual cost." (Docket Entry No. 54, Ex. C-81). And the indictment under which Matkarimov was found guilty charged him along with sixteen other businessmen with "fraudulent business activities," including "violation of customs regulations." Matkarimov personally was charged with "avoiding taxes and customs fee payments." (Docket Entry No. 54, Ex. C at 190–91; No. 48, Ex. 1-N).

Liberty also points out that much of the information from CRI that Interspan contends led it to believe that Gulnara Karimova was attempting to take over its business actually came from Interspan itself, or from Rudd after February 22, 2006. After that date, Rudd was reporting directly to Interspan and allegedly had a financial incentive to bolster Interspan's insurance case. Johnson was the first to raise the possibility of Karimova's involvement to CRI. On February 16, 2006, reporting on his initial contact with interspan, Hildreth told Van Wagenen that "[Johnson] advised that he has learned that reportedly the force behind this apprehension of Kiamilev is the daughter

76

of the President of Uzbekistan." (Docket Entry No. 32, Ex. 2-J).[32] Johnson contacted Hildreth again on February 20, 2006, to relay that the Uzbek authorities intended to move Kiamilev from the International Hospital to a prison with an infirmary.  Hildreth reported to Van Wagenen: "The client says that the facility is described as a torture chamber (their words) and that once there the victim will be forced to turn over the company, admit to the charges and then probably we will be notified that he died while in custody from the heart condition.  Again this is the client's description not mine."  (Docket Entry No. 32, Ex. 2-M).  It was in response to Johnson's report as to prison conditions that Hildreth advised Johnson to "consider putting up the company/inventory as bond for the victim," and stated that "[o]bviously the victim will never return and the company will lose its inventory and warehouses/offices, but that is going to happen anyway."  (*Id.*).  Eskender Kiamilev was released the following day without any such bond being posted.

On February 22, 2006, the day after Kiamilev's release, Johnson and Rudd entered into an agreement in principle to recover Interspan's assets in exchange for 5% of anything recovered. (Docket Entry No. 54, Exs. C-64, C-65, C-66).  Liberty questions the credibility of all statements by Rudd after that date, arguing that the agreement gave Rudd "a financial interest in Interspan's recovery of insurance proceeds."  (Docket Entry No. 54 at 16).  Interspan counters that it proposed the deal only because it could not afford the $1,700  to $2,000 per diem quoted by CRI, and that in any event the deal was never finalized because CRI went "back on the case" five days later, after Matkarimov's arrest.  (Docket Entry No. 54, Ex. C at 90–92, 170–71).  But Johnson's statement is

---

[32]  The specificity of Johnson's statement contrasts to Bakhrom's statement to Hildreth the following day that "Uzbek partners of Interspan have been unable to learn why Eskender was arrested and the warehouses seized," but that Bakhrom believed the reason for Kiamilev's detention to be "a mixture of politics, poor relationship between [the U.S. and Uzbekistan] and the desire of another organization to gain distributorship" of Interspan's tea brands.  (Docket Entry No. 32, Ex. 2-K).

at least facially inconsistent with Johnson's email to Rudd after Matkarimov's arrest.  The email stated that if Rudd helped gather evidence for Interspan's insurance claim, Interspan would use the funds recovered to "pay our agreed fee with you."  (Docket Entry No. 54, Ex. C-138).  There is also substantial evidence that Rudd continued to work on Interspan's case during CRI's "stand down" between March 8, 2006 and June 15, 2006, during which time neither party disputes that CRI was not paying Rudd's bills, and it is undisputed that Rudd reported directly to Interspan.  There is at least a fact issue as to an agreement between Rudd and Interspan and the effect of any such agreement on the objective reliability of Rudd's reports.

Liberty also argues that Interspan may have had a motive to fabricate the reason for the actions against the company.  Liberty points out that Interspan's sales were "stagnant"—though still profitable—as of August 2005, and that by November 2005, Johnson and Emir Kiamilev had concluded that they would we willing to sell the entire business for $4 million.  (Docket Entry No. 54, Exs. C-59, D-150).

Interspan has presented evidence that it understood the information available to it as conveying a threat covered by the Policy and that such an understanding was objectively reasonable. Interspan has submitted evidence in the record showing that it believed members of Uzbekistan's ruling family had decided to take over Interspan's business and would injure relatives of Interspan's principals and its employees until it surrendered its business interests and assets.  Liberty has presented evidence that raises disputed fact issues as to whether in fact there was a threat, objectively and reasonably understood, and whether the "Collusion or Fraud" exception applies. These fact issues preclude this court from ruling as a matter of law as to coverage under Hazard 2.

**2.      Whether Interspan Has Shown a Loss Resulting from the Alleged Threat**

Liberty also contends that Interspan has not met its burden of proving a "LOSS" in connection with Hazard 2 of the Special Coverages Policy. Liberty argues that no "LOSS" has been shown because there is no evidence that Interspan gave up its assets in exchange for Kiamilev's or Matkarimov's release. According to Liberty, "assuming what they say to be true is true, the business was taken away; it wasn't surrendered to forebear some threat; it wasn't surrendered as an extortion." (Docket Entry No. 90 at 61).

The Policy does not require that the "LOSS" be *in exchange for* avoiding a threat. The Policy requires "LOSS" "*by reason of* the receipt of a threat, communicated directly or indirectly to the INSURED to kill, injure or KIDNAP an Insured Person, RELATIVE or GUEST." (Docket Entry No. 32, Ex. 1-A). Interspan asserts that assets were seized when Eskender Kiamilev was arrested. Interspan made no effort to claim or retrieve any business asset or interest in Uzbekistan because the arrests and detention of Kiamilev and Matkarimov and the trial and conviction of Matkarimov made it reasonable to believe that its principals and employees believe that they would be illegally arrested or harmed if they attempted to do so.

The proof of loss that Interspan submitted to Liberty claimed a total of over $24.6 million in loss, including $9,594,436.72 for the "market value" of a business for which Emir Kiamilev had stated less than a year earlier that he would take $4 million "any day" and for which Johnson had deemed a price tag of $ 6 million "crazy." (Docket Entry No. 54, Ex. C-59). In his deposition, Johnson was asked: "[W]hat did Interspan lose that it's now trying to recover?" Johnson answered: "everything" and refused to be more specific. (Docket Entry No. 54, Ex. C at 238–39). As evidence of loss, Interspan has submitted pro forma invoices for its purchase of over $400,000 worth of tea from its suppliers between September 30, 2005 and February 2006; documents reflecting payments made to those suppliers during that same period; a profit and loss chart and balance sheet for the

fiscal year 2002; its July 9, 2006 insurance claim; and an affidavit from Johnson stating that "Interspan lost all of its operations and business assets in Uzbekistan," including "an inventory of tea . . . some cash, traveler's checks, packaging equipment, and other appliances and certain other physical assets" that the Uzbekistan government retained after Matkarimov's conviction.  (Docket Entry No. 32, Ex. 1 ¶ 24; No. 46, Ex. 2-A).  Interspan contends that it could not submit more specific documentation of its loss because many of the relevant documents were seized by Uzbek government authorities or are inaccessible because Interspan's principals fear that they cannot safely return to the country.  But Liberty contends that the scant proof that Interspan has offered does not meet Interspan's burden of establishing the "LOSS" element of coverage under the Special Coverages Policy.  Interspan also contends that it was Liberty's duty to research the actual amount of loss before denying coverage.  But Liberty's duty to research is relevant only to the breach of duty of good faith claim; it is not relevant to the breach of contract claim.  *See Provident*, 988 S.W.2d at 198; *Stoker*, 903 S.W.2d at 340–41; *Parkans*, 299 F.3d at 519.

The record evidence also raises an issue as to which inventory and assets were actually "lost" and whether the losses might have been mitigated.  In February 2006, Rudd emailed Johnson about "$800,000 of tea currently in customs bond" and indicated that Furkhat, Interspan's customs broker, should be capable of releasing the tea for sale.  In that same email, Rudd stated that Interspan had $1,200,000 in tea located in two warehouses and that the inventory in Uzbegim's name "should immediately be transferred to another location."  This email suggests that Interspan had control over at least some of its assets even after they were allegedly seized in connection with Eskender Kiamilev's arrest.  (Docket Entry No. 32, Ex. 1-E).  Emir Kiamilev testified that as late as October 2006, well after Matkarimov's conviction, there was a container of Interspan tea remaining in the customs bonded warehouse that "maybe wasn't confiscated" and that Interspan tried to transfer that

80

container to Uzbegim.  Kiamilev testified that the transfer never occurred but did not know why. (Docket Entry No. 54, Ex. D at 172–73).

Interspan has presented evidence of its losses, but Liberty has countered with evidence that raises disputed fact issues as to whether the claimed amounts are covered "LOSSES"; the amount of these alleged losses; and whether Interspan 's action was "reasonable, prudent, and in good faith under the circumstances."  The parties' cross-motions for summary judgment as to Hazard 2 are denied.

### D.    "Additional Coverage" for Legal/Medical Expenses

The Special Coverages Policy provides "Additional Coverage" for "any legal fees, legal judgments[ or] legal settlements . . . incurred by the INSURED based on or arising out of incidents insured by this Policy."  (Docket Entry No. 32, Ex. 1-A at 18).  Interspan has moved for summary judgment under the "Additional Coverage" clause, contending that the "physical property referenced in the judgment" against Matkarimov is a "legal judgment" compensable under the Additional Coverage clause.  (Docket Entry No. 32 at 24).  Because there are disputed fact issues as to coverage under Hazard 2, Interspan's motion is denied.

Liberty has cross-moved for summary judgment on the basis that the evidence does not show that Interspan owned any of the property seized as part of the judgment against Matkarimov.  Liberty argues that the English translation of the judgment against Matkarimov does not even identify Interspan as the owner of any of the property seized.  (Docket Entry No. 36 at 4).  Interspan responds by pointing to Johnson's affidavit stating that the Russian language document does in fact name Interspan and describe the goods seized.  (Docket Entry No. 32, Ex. 1 ¶ 24).  Liberty has raised a fact issue as to ownership that cannot be resolved on the present record.

The cross-motions for summary judgment as to the "Additional Coverage" clause are denied.

81

### E.    Breach of Duty of Good Faith and Fair Dealing

Liberty has moved for summary judgment that it did not breach the Texas common-law duty of good faith and fair dealing.  (Docket Entry No. 38).  Interspan counters that "Liberty ignored almost daily reports" from CRI that "indicated that the incidents affecting Interspan in Uzbekistan reflected an extortion situation covered under Liberty's Policy."  Interspan contends that these reports "told Liberty, unequivocally, that (I) the incidents involving Interspan were orchestrated by certain powerful indivduals, including Gulnara Karimova, the daughter of Uzbekistan's president; (ii) these powerful individuals were putting Interspan's principals and certain of their relatives at risk of suffering physical injury; and (iii) the objective of these efforts was to coerce Interspan into surrendering its business."  Interspan accuses Liberty of failing "to undertake anything approaching a reasonable investigation" before "denying coverage on some very specific grounds."  (Docket Entry No. 48 at 1–2).  Liberty agreed that it conducted no investigation beyond reviewing the information CRI before denying Interspan's claim, and that CRI in turn relied almost exclusively on Rudd for information from Uzbekistan.

"An insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims."  *Stoker*, 903 S.W.2d at 340.  "A breach of the duty of good faith and fair dealing is established when: (1) there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy and (2) the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim."  *Id.*  Inadequately investigating a claim before denial can provide a basis for concluding that an insurer violated its common-law duty of good faith and fair dealing.  *Provident Am. Ins. Co.*, 988 S.W.2d at 198; *Viles*, 788 S.W.2d at 566.

Interspan has raised a fact issue sufficient to survive summary judgment on its common-law breach of good faith claim. "As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." The merits of the breach of the duty of good faith and fair dealing claim are properly considered after a determination as to whether Liberty breached the Special Coverages Policy. *See Stoker*, 903 S.W.2d at 341. Liberty's motion for summary judgment on Interspan's claim for breach of the duty of good faith is denied.

## IV.  Conclusion

Interspan's motions for partial summary judgment are denied. The motions *in limine* are denied, without prejudice . Liberty's cross-motions for partial summary judgment are denied except as to Liberty's motions for partial summary judgment on Hazard 1 (Kidnap/Extortion) and as to agency, which are granted. Liberty's evidentiary objections are overruled. A scheduling conference is set for **September 17, 2009, at 9:00 a.m.** in Courtroom 11-B.

SIGNED on August 21, 2009, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

83